**In re Herman Andrew MARTIN, Debtor.**

**Bankruptcy No. 95–32026–S.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Nov. 7, 1995.

---

Charles C. Cowsert, III, Fredericksburg, VA, for Debtor.

Gerald F. Daltan, Scott, Daltan & Van Lear, Fredericksburg, VA, for Unsecured Creditor.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY,
Bankruptcy Judge.

This matter comes before the Court upon the objection of John E. Mitchell, Jr. ("Mitchell"), to confirmation of the Chapter 13 reorganization plan submitted by Herman Andrew Martin ("Martin" or the "Debtor"), filed in this Court on June 2, 1995. Mitchell objects to the Debtor's plan on several grounds, alleging primarily that the Debtor did not submit his plan in good faith as required by 11 U.S.C. § 1325(a)(3). Mitchell also asserts that the Debtor's plan does not provide for all of the Debtor's net disposable income as required by 11 U.S.C. § 1325(b)(1), and that the Debtor's plan reflects unfair discriminatory treatment of certain unsecured debts. The Court conducted a hearing on this matter on August 9, 1995, at which time counsel for the Debtor and Mitchell presented evidence and argument. At the conclusion of the hearing, the Court ordered both parties to submit a list of supporting citations.

This is a core proceeding, over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2)(L) and 1334. Upon consideration of the pleadings, the record, the evidence, and the argument of counsel, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

On the 20th of October, 1992, Martin pled guilty to a charge of misdemeanor assault and battery in a Spotsylvania County General District Court. The genesis of Martin's guilty plea was an incident in August of 1992 during which Martin apparently struck Mitchell in the head, resulting in considerable physical damage to Mitchell. Nearly a year and a half later—in February of 1994—a Spotsylvania County Circuit Court entered judgment against Martin and in favor of Mitchell in a civil suit stemming from the August 1992 assault and battery. After a jury trial, the Spotsylvania County Court awarded Mitchell a judgment of $100,000 in compensatory damages plus costs—significantly less than the $500,000 in compensatory and punitive damages originally sought by Mitchell.

Over the course of the next several months, Mitchell and Martin, through counsel, conducted lengthy negotiations in an attempt to arrive at a mutually agreeable payment schedule for the judgment award. Unfortunately, those negotiations were not successful, and although Martin made two voluntary payments of $300, Mitchell initiated gar-

nishment proceedings against Martin in July of 1994.

On May 18, 1995, Martin filed a voluntary petition in bankruptcy, seeking the protection of this Court under Chapter 13 of the Bankruptcy Code. On June 2, 1995, Martin filed his Chapter 13 plan. Martin's plan proposed that he pay all of his disposable income—some $375 per month—into the plan for thirty-six months. Martin's plan listed a total of one secured and six unsecured creditors, the debt to Mitchell being the largest.

Martin is currently married, and his wife's marital duties include organizing and maintaining the couple's finances. Martin's plan states that his wife earns a monthly income nearly equal to his own, and that she is responsible for half of the couple's monthly housing costs. But his wife did not enter into bankruptcy in a joint case or otherwise.

While Martin currently has a steady job, he did voluntarily change his place of employment in early 1994. For a period of 11 years, ending in January or February of 1994, Martin worked as a truck driver for the Martin Brower Corporation, and earned a reported compensation of $44,000 in 1993. Martin was a truck driver, and spent an average of two nights a week away from home. But in early 1994, Martin voluntarily left Martin Brower and became unemployed. Martin's testimony was unclear as to the exact date of his resignation, but based upon correspondence from his counsel, he was definitely no longer employed at Martin Brower as of mid-February, 1994.

Martin testified at length regarding his motivation for leaving Martin Brower and becoming unemployed. Martin Brower had apparently changed ownership sometime prior to Martin's resignation, and Martin's job description had changed accordingly. Martin testified that after his employer's ownership change, he was required to unload his truck onto hand-trucks and carry the load into stores and up stairways—always under demanding time constraints. Previously, his work consisted only of driving his truck to store locations, and using a conveyor belt system to push his load off of his truck to a receiving area. His new job requirements represented a significant increase in physical labor.

In March of 1994, Martin began working for his current employer, CVS. Evidence revealed that Martin received compensation from CVS totaling $26,224.09 in 1994, and $20,610.84 through August 5th of 1995—substantially less than Martin's earnings at Martin Brower. Further testimony and evidence established that Martin's compensation from CVS was based upon an hourly wage of $14.80, plus mileage pay at a rate of $.3639 per mile. But since Martin's work and mileage compensation vary from week-to-week based upon a seniority system for available work, this Court is convinced that an accurate determination of Martin's compensation cannot be arrived at by a simple hourly wage rate calculation.[1] Instead, Martin's monthly wages can only be estimated by extrapolating from year-to-date earnings and adjusting that figure based upon known variations. As explained more fully below, this Court declines to make a finding of fact as to Martin's actual monthly or annual wage.

### CONCLUSIONS OF LAW

This Court must answer three separate questions in order to reach a decision in this matter. First, after considering the facts and circumstances as outlined above, does the Debtor's Chapter 13 plan meet the "good faith" standard mandated by 11 U.S.C. § 1325(a)(3)? Second, does the Debtor's plan reflect unfair discriminatory treatment of a selected class of unsecured debts which is impermissible under 11 U.S.C. § 1322(b)(1)? And lastly, does the Debtor's Plan require the Debtor to pay all of his

---

1. For example, a pay statement entered into evidence shows that Martin earned $470.64 in hourly wages and $118.27 in mileage pay during the week ending August 5, 1995—pay period # 32. If pay period # 32 were representative, Martin's year to date earnings should equal approximately $18,845.12. However, a CVS representative testified that Martin's year to date earnings through pay period # 32 actually totaled $20,610.84—a difference of 9%. The variations in number of hours worked and miles traveled in any given week make the estimation of Martin's disposable income a difficult and imprecise exercise.

projected disposable income into the plan as required by 11 U.S.C. § 1325(b)(1)(B)?

■ Chapter 13 requires that all confirmable plans be proposed in "good faith," and "not by any means forbidden by law." 11 U.S.C. § 1325(a)(3) (West 1995). Unfortunately, the Bankruptcy Code fails to define the phrase "good faith" either directly by way of a code provision, or indirectly in the form of legislative history. As a result, the "good faith" requirement has evolved into an elastic concept, dependent for the most part on the facts and circumstances of the particular case and the discretion of the court. In a 1987 decision, one court correctly noted that "[m]ore than 300 reported 'good faith' decisions form a maze of rules and exceptions swallowing rules. Nearly identical fact patterns have produced inconsistent results within judicial districts and across the circuits." *Nelson v. Easley (In re Easley)*, 72 B.R. 948, 950 (Bankr.M.D.Tenn.1987). The truth of that statement has not changed significantly in the intervening years.

This Court last discussed the Chapter 13 good faith issue two years ago in *In re Thorsted*, 157 B.R. 5 (Bankr.E.D.Va.1993). *Thorsted* involved a debtor who had filed his Chapter 13 proceeding immediately after receiving a discharge under Chapter 7. In *Thorsted*, this Court relied heavily upon two Fourth Circuit decisions—*Deans v. O'Donnell*, 692 F.2d 968 (4th Cir.1982), and *Neufeld v. Freeman*, 794 F.2d 149 (4th Cir.1986)— and constructed a framework within which to conduct a § 1325(a)(3) good faith inquiry.

> A finding that a plan was not filed in good faith requires an "inquiry ... to determine whether or not, considering 'all militating factors,' there has been 'an abuse of the provisions, purpose or spirit' of Chapter 13." The debtor's prepetition conduct "is a relevant factor to be considered in the § 1325(a)(3) good faith inquiry." "[A] Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct

> where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims."

*Thorsted*, 157 B.R. at 9–10 (internal citations omitted).

In *Deans*, the Fourth Circuit Court of Appeals considered a Chapter 13 plan and denied confirmation because the plan failed to make substantial and meaningful payments to unsecured creditors. *Deans*, 692 F.2d at 969. The *Deans* Court rejected any *per se* test, and held that courts making a "good faith determination" must consider "the totality of circumstance ... on a case by case basis in order fairly to apply [§ 1325(a)(3) ]." *Id.* at 972. The *Deans* Court went on to enumerate a non-exhaustive "check-list" of factors to be considered in making the "good faith" determination.[2] *Id.*

In its later decision, *Neufeld v. Freeman*, the Fourth Circuit Court of Appeals considered a debtor's Chapter 13 Plan wherein a significant portion of the unsecured debt was incurred as a result of the debtor's intentional fraudulent activity. 794 F.2d at 150. The *Neufeld* Court expanded upon its earlier holding in *Deans*, stating that "although the discharge of an obligation which would be nondischargeable in Chapter 7 is not, standing alone, a sufficient basis on which to find bad faith or deny confirmation, it is a relevant factor to be considered in the § 1325(a)(3) good faith inquiry." *Id.* at 152.

Applying the framework of analysis outlined above to the facts, this Court concludes that the Debtor has adequately met his burden of establishing that his plan was filed in good faith. After becoming liable to Mitchell for the $100,000 judgment—a debt admittedly the fault of Martin although perhaps not foreseeable—Martin also entered into negotiations to satisfy the judgment and made two voluntary payments towards that end before becoming subject to salary garnishment. Taken in context, the facts and circumstances

---

**2.** Specifically, the *Deans* Court stated that courts should consider:

the percentage of proposed repayment, ... the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and

amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor.
*Deans* at 972.

of this case describe a debtor who was subject to salary garnishment for a period of ten months and who then sought bankruptcy protection within the spirit and the purpose of Chapter 13. Martin stated repeatedly in his testimony that he simply could not continue any longer without protection from his creditors. This Court finds his testimony credible, and declines to make a finding that Martin's sole motivation in filing his Chapter 13 petition was to evade an otherwise nondischargeable debt.

■ Mitchell urges that this Court deny confirmation on good faith grounds based upon the synergy of a number of factors. Specifically, Mitchell points to the origin of the underlying debt, the percentage of payment to unsecured creditors in the plan, the length of the plan, the pre-petition conduct by Martin—to include quitting one job and then accepting lower paying employment—and an alleged dishonesty in reporting income to the trustee. Mitchell has provided this Court with an abundance of case cita-

tions wherein courts faced with somewhat similar fact patterns have denied plan confirmation on good faith grounds or outlined relevant Chapter 13 good faith standards.[3] However, analysis of debtor good faith must proceed on a case by case basis. *Deans,* 692 F.2d at 972. And after mature consideration of each of the factors cited by Mitchell—within the context of the totality of the circumstances of this case—this Court declines to accept Mitchell's analysis.

At the same time, this Court cannot deny the compelling nature of Mitchell's allegations. Accordingly, the Court chooses to address Mitchell's principal allegations, and provide insight into the Court's rationale.

To begin, Mitchell first points out that the overwhelming majority of Martin's debt—nearly 55% of his total debt and 94.8% of his unsecured debt—would arguably be determined non-dischargeable if Martin had sought bankruptcy protection under Chapter 7.[4] But that fact, in and of itself, in not

---

**3.** *See United States v. Estus (In re Estus),* 695 F.2d 311 (8th Cir.1982) (rejected debtor's fifteen month Chapter 13 plan as not filed in good faith); *In re Liggins,* 145 B.R. 227 (Bankr. E.D.Va.1992) (stating that a minimal percentage payment to general unsecured creditors warranted a close examination of Chapter 13 good faith filing factors); *Grundy Nat'l Bank v. Johnson,* 106 B.R. 95 (W.D.Va.1989) (vacating debtor's Chapter 13 plan on other grounds and outlining good faith analysis standards); *In re Kazzaz,* 62 B.R. 308 (Bankr.E.D.Va.1986) (permitting a debtor's Chapter 13 Plan which provided for a 16% payment to unsecured creditors); *In re Baber,* 57 B.R. 597 (Bankr.W.D.Va.1986) (denying debtor's conversion of Chapter 7 proceeding to one under Chapter 13 as motivated solely by desire to gain discharge of otherwise nondischargeable debt); *In re Dant,* 9 B.R. 117 (Bankr. E.D.Va.1981) (denying confirmation of debtor's Chapter 13 plan as representing a *de minimis* repayment plan and thus not filed in good faith); *In re Heyer,* 13 B.R. 610 (Bankr.E.D.Va.1981) (finding lack of good faith in debtor's Chapter 13 Plan which pays only small percentage of unsecured debts when debtor has the ability to pay more).

**4.** The Bankruptcy Code exempts from discharge under Chapter 7 any debts which are the result of willful and malicious injury by the debtor to another entity or the property of another entity. *See* 11 U.S.C. 523(a)(6) (West 1995). Courts have used this provision to exempt from Chapter 7 discharge those debts arising from intentional torts or criminal actions such as assault and

battery. *See, e.g., Davis v. Williams, (In re Williams),* 173 B.R. 912, 914 (Bankr.W.D.Ark. 1994) (finding that conviction for assault and battery within the context of Arkansas criminal statutes constituted sufficient evidence to satisfy the willful and malice prongs of 11 U.S.C. § 523(a)(6)). Moreover, debtors may be collaterally estopped from denying or relitigating a prior state court determination of willful and malicious behavior which would satisfy a § 523(a)(6) inquiry. *See Hagan v. McNallen (In re McNallen)* 62 F.3d 619, 624 (4th Cir.1995). In this case, Debtor's counsel argues that since Martin pled guilty to misdemeanor assault and battery, and the civil jury refused to award punitive damages, the willful and malicious elements of § 523(a)(6) have not yet been demonstrated. Martin may be correct. Conviction of misdemeanor assault and battery in Virginia does not necessarily require the presence of malice as an element in the subject action. *See* Va.Code Ann. § 18.2–57 (Michie 1988); *Barrett v. Commonwealth of Va.,* 231 Va. 102, 341 S.E.2d 190, 192–94 (1986) (stating that "malice excludes passion and passion presupposes the absence of malice," and that the trial court erred by providing a jury instruction on malicious wounding while refusing to provide an instruction on the lesser included offense of unlawful wounding—which does not require the presence of malice—[and to which assault and battery is an even lesser included offense]); *and see, e.g.,* 1 Model Jury Instructions Committee, Virginia Model Jury Instructions, Instruction No. 38.100 (Michie 1994 Suppl.) (stating that assault and battery is a less-

dispositive. *See, e.g., Neufeld,* 794 F.2d at 152.

The statutory provisions of Chapter 13 permit the discharge of a number of debts that would be nondischargeable under other chapters of the Bankruptcy Code. This Court is aware that some Courts have looked to the nature of the underlying debt as a primary factor in denying Chapter 13 plan confirmation—particularly in the case of larceny and fraud or debts resulting from particularly egregious behavior with foreseeable consequences. *See, e.g., In re Sitarz,* 150 B.R. 710 (Bankr.D.Minn.1993) (denying confirmation of debtor's Chapter 13 plan based *inter alia* on good faith grounds because debtor intentionally financially defrauded creditor); *Handeen v. LeMaire (In re Le-Maire),* 883 F.2d 1373 (8th Cir.1989) (panel decision), *vacated,* 891 F.2d 650 (8th Cir. 1989), *on rehrg.,* 898 F.2d 1346 (8th Cir.1990) (*en banc*) (denying confirmation of debtor's Chapter 13 plan on good faith grounds after the debtor, who had attempted to murder the objecting creditor, stipulated to damages in a civil suit, and then filed his Chapter 13 plan in a clear and obvious attempt to avoid paying the stipulated damages); *In re Chase,* 43 B.R. 739 (D.C.1984) (denying plan confirmation for lack of good faith when debtor entered into consent agreement—in exchange for creditor's promise not to testify at criminal sentencing and to drop civil suit—and immediately filed Chapter 13 petition). But the underlying debt is not the only factor to be considered.

This Court believes that Martin's pre-petition behavior, while reprehensible, does not rise to the level of that described in *Sitarz* and *LeMaire,* and is factually distinguishable from *Chase.* Taken as a whole, the facts and circumstances do not outline a debtor who is manipulating the system to take advantage of ill-gotten gains, or to escape his responsibili-

ty for egregious behavior. To be sure, this Court does not condone Martin's behavior, and feels a great deal of empathy toward Mitchell. But the totality of circumstances presented by the Debtor demonstrates that Martin did file his petition in good faith, notwithstanding the underlying nature of his largest debt.

Mitchell also points to the small percentage of payment to unsecured creditors within Martin's plan—as well as the length of the plan—as indicators of a lack of good faith. It is well settled that there exists no *minimum percentage* payment requirement in Chapter 13 proceedings. *See In re Liggins,* 145 B.R. 227, 230 (Bankr.E.D.Va.1992). Chapter 13 requires that creditors receive at least as much under any plan as they would receive in a Chapter 7 liquidation. *See* 11 U.S.C. § 1325(a)(4) (West 1995). And once objected to, a confirmable Chapter 13 plan must commit all of a debtor's disposable income for a minimum 36 month period. 11 U.S.C. § 1325(b)(1)(B) (West 1995). So long as these requirements are met, a small percentage payment to unsecured creditors, taken by itself, does not result in automatic rejection of a plan for lack of good faith. Martin has not made the claim that he will receive less under this plan than he would in a Chapter 7 liquidation, but only that the small percentage payment and the plan's minimum 36 month duration represent bad faith on their face.

While a payment percentage as low as 6% demands increased scrutiny, this Court declines to make a finding that the percentage payment in Martin's plan amounts to a lack of good faith. Martin's plan proposes to commit all of his disposable income for the minimum 36–month period made mandatory by Mitchell's objection. Absent additional considerations, this Court is unwilling to im-

er included offense of malicious wounding—which is properly found when malice has not been established, but instead that the act was done in an angry, rude or vengeful manner). And based upon the submitted record—to include the relevant civil proceeding Motion for Judgment and Judgment Order—this Court cannot conclude that Martin's civil proceeding jury found that Martin had committed his intentional tort with willful intent and malice. Lastly, since

the existence of the equivalent of malice is one element of a punitive damages award, *see Hamilton Dev. Co. v. Broad Rock Club, Inc.,* 248 Va. 40, 445 S.E.2d 140, 143 (1994), the fact that Martin's civil proceeding jury refused to award punitive damages may indicate that malice was not demonstrated. But this Court is not required to make any finding with respect to Martin's Chapter 7 dischargeability under § 523(a)(6), and accordingly, declines to do so.

pose requirements onto debtors and their plans which are not mandated by relevant statutes.

With respect to the length of Martin's Chapter 13 plan, as previously stated, the Bankruptcy Code mandates a minimum of 36 months duration for any plan objected to unless that plan pays 100% of allowed unsecured claims. 11 U.S.C. § 1325(b)(1)(B) (West 1995). But the Code also sets a maximum duration of 60 months for Chapter 13 plans, and requires the debtor to show cause for extending any plan beyond 36 months. "The [Chapter 13] plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years." 11 U.S.C. 1322(d) (West 1995).

Generally, the opportunity to extend a plan beyond 36 months duration—while at the same time limiting that extension to 60 months total plan length—exists as a means of permitting debtors to fashion workable Chapter 13 plans without becoming indentured servants. By permitting some flexibility, § 1322(d) permits debtors with a small disposable income to extend their plan long enough to overcome the inability to cure defaults under § 1322(b)(5), or pay priority or secured claims in a shorter period of time. *See* 5 Collier on Bankruptcy ¶ 1322.15 (15th ed.). "Although cause [as used in § 1322(d) ] is not defined in the Code, bankruptcy courts have extended Chapter 13 plans to five years where a large portion of the debtor's obligations consist of nondischargeable debt, such as guaranteed student loans." *Washington Student Loan Guaranty Assoc. v. Porter (In re Porter )*, 102 B.R. 773, 777 (9th Cir. BAP 1989).

The time limit provisions of § 1322(d)— and the ability to extend a Chapter 13 plan beyond 36 months—are provisions enacted for the debtor's benefit. To *require* the Chapter 13 debtor to extend his plan beyond the three year minimum period in order to create a cache of payments much larger than the debtor's current liquidated asset value— ostensibly for the creditors' sole benefit— would thwart the statutory requirements and intent of Chapter 13; however, to *permit* the

debtor to extend beyond the three-year period to provide for payments of at least the liquidated value of the estate may be sufficient cause for the Court to approve such a request. This viewpoint is generally supported by case law. *See, e.g., In re Pierce*, 82 B.R. 874 (Bankr.S.D.Ohio 1987) (holding that debtor may voluntarily extend plan longer than 36 months to increase dividend to unsecured creditors, but may not be forced to do so); *In re Greer*, 60 B.R. 547 (Bankr. C.D.Cal.1986) (holding that lack of any payment to unsecured creditors in three year plan period was not sufficient cause to extend plan); *Porter*, 102 B.R. at 777 (holding that absent some compelling reason, debtor's should not be forced to pay into a plan for longer than three years); *In re Vensel*, 39 B.R. 866 (Bankr.E.D.Va.1984) (holding that debtor is under no obligation to propose a five-year plan as opposed to a three-year plan); *cf. Arnold v. Weast (In re Arnold, )*, 869 F.2d 240 (4th Cir.1989) (holding that substantial and unforseen increase in debtor income—not discovered until 30 months into the plan—was sufficient cause to require debtor to increase plan length from 36 to 60 months).

Had Congress intended otherwise, § 1322(d) could have been fashioned in a manner that required a longer plan length based upon the plan's percentage payment. Congress apparently desired to grant debtors a degree of flexibility within the provided limits, and absent some additional showing of bad faith, this Court will not second guess that scheme. This Court therefore rejects Mitchell's assertion that the length of Martin's plan combined with the small percentage payment to unsecured creditors represents less than a good faith filing.

Mitchell's final good faith allegations center on Martin's employment situation and honesty in reporting income. This Court finds Martin's testimony with respect to his employment entirely credible. Martin stated that he left his employer of eleven years only after an ownership change introduced far more rigorous physical requirements into his job, dramatically increasing both the difficulty and duration of his work day. Martin also cited his desire to reduce his average work-

day from its fifteen to eighteen hour length to something more reasonable, and to discontinue "long haul travel" which required his absence from home an average of two nights per week.

Martin's testimony portrayed a picture of a man who needed to change his employment, and who was willing to take a pay cut to do so. This Court would be more inclined to give some consideration to Martin's employment change as an indication of bad faith had the change occurred on the eve of bankruptcy. But Martin changed jobs more than a year before his bankruptcy filing. Although Martin's disposable income is smaller today than it would have been in 1993—and the resulting payment to creditors out of that disposable income is smaller accordingly— and while Martin's change of jobs and lower income may have ultimately caused his entry into bankruptcy due to a lack of sufficient funds after garnishment,[5] this Court accepts Martin's explanation for his employment decision as being predicated on factors other than his bankruptcy proceeding or denying creditors satisfaction on their claims.

With respect to Martin's good faith in portraying his wages, this Court made a finding of fact that Martin's monthly wages, by their very nature, are difficult to estimate. Martin testified that his wife takes care of all of the financial matters in his family, and that he arrived at his plan wage figures using what he perceived as his average monthly take home pay—testimony that this Court finds credible. While Martin's portrayal of his wages may not have been entirely accurate,

this Court can point to no evidence that Martin intentionally submitted incorrect wage information in his Chapter 13 filing.

At their very essence, Mitchell's good faith allegations appear to focus primarily upon the nature of Martin's primary unsecured debt—a judgment for an intentional tort— and an attempt to demonstrate the unseemliness of discharging 94% of that debt. But this Court must simply construe the law, not construct it. It is up to Congress to write the law. And if denying debtors an opportunity to discharge in a Chapter 13 proceeding those debts derived from committing intentional torts has sufficient moral, social or economic value, then it is up to Congress to take appropriate action. Until that time, this Court is constrained by the law as written. And based upon the totality of the circumstances of this case, this Court concludes that Martin successfully demonstrated that he proposed his Chapter 13 plan in good faith.

■ Moving on, Mitchell also objects to the Debtor's plan on a second basis, pointing out that the plan classifies unsecured debts, and pays selected unsecured debts in full. Mitchell claims that this classification and payment scheme has the effect of unfairly discriminating against his unsecured claim.

While not stated in Mitchell's Objection, this allegation apparently arises under § 1322(b)(1) which states that

the [Chapter 13] plan may—(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but

---

5. Under relevant Virginia statutes, a garnishing creditor may subject up to 25% of a debtor's weekly disposable earnings to garnishment. *See* Va.Code Ann. § 34–29 (Michie 1995 Suppl.). The term "disposable earnings" is defined as "that part of the earnings of an individual remaining after the deduction from those earnings of any amounts required by law to be withheld." *Id.* at § 34–29(d)(2). With some exceptions, the Virginia statute preserves a minimum weekly salary for the debtor equal to thirty times the federal minimum hourly wage. *Id.* at § 34–29(a)(2). But, unlike a Chapter 13 plan—which permits the debtor to fashion a plan and safeguard sufficient funds to provide for his living expenses—a garnishment may deduct more funds from a debtor's paycheck than that debtor can afford. Thus, in garnishment—unlike a Chapter 13 plan—a reduction in weekly pay not only reduces

the amount paid to the garnishing creditor, but may also reduce the funds available to the debtor to pay for his particular minimum living requirements. While it is easy to understand why a Chapter 13 debtor would accept an easier but lower-paying job—thereby reducing the disposable income available to creditors while maintaining the same income available to himself to provide for living expenses—a debtor under garnishment would place himself in a very precarious position by reducing his weekly wages since he may not be able to adequately protect his minimum living expenses. This Court can easily envision a scenario wherein a person under garnishment whose take-home pay is reduced may be forced to resort to bankruptcy proceedings in order to maintain a minimum standard of living for himself and his family.

may not discriminate unfairly against any class so designated; however, **such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims.**

11 U.S.C. § 1322(b)(1) (West 1995) (emphasis added).

Courts have uniformly adopted a four factor test with which to analyze and detect the unfair discrimination prohibited by the first portion of § 1322(b)(1).[6] But courts have not reached the same unanimity with respect to their interpretation of the second portion of § 1322(b)(1).

Some courts have interpreted the awkward language of § 1322(b)(1) as creating a "carve out" or exception to the otherwise applicable unfair discrimination test when co-signed debts are separately classified. *See In re Dornon,* 103 B.R. 61, 64 (Bankr.N.D.N.Y. 1989); *In re Lawson,* 93 B.R. 979 (Bankr. N.D.Ill.1988); *In re Chapman,* 146 B.R. 411, 416 (Bankr.N.D.Ill.1992). The *Dornon* court—presented with a debt co-signed by the debtor's mother—relied upon Congressional intent,[7] and a plain reading of the statute before approving a plan which proposed to pay 100% of a separately classified co-signed debt, but which only proposed to pay 10% of other unsecured debts. *Dornon,* 103 B.R. at 62. *Dornon,* and its progeny, interpreted the "however" in § 1325(b)(1) to permit otherwise discriminatory treatment of co-signed unsecured debts within Chapter 13 plans. Presumably, this discriminatory

treatment was necessary to ensure that the debtor had a fair opportunity to complete the plan provisions and receive a "fresh start" without overwhelming pressure to make additional payments outside of his plan.

Other courts have interpreted § 1322(b)(1) to permit different treatment of co-signed debts, but not a different treatment that would permit unfair discrimination. *See, e.g., In re Cheak,* 171 B.R. 55 (Bankr.S.D.Ill. 1994); *In re Battista,* 180 B.R. 355 (Bankr. D.N.H.1995); *Spokane Credit Union v. Gonzales (In re Gonzales),* 172 B.R. 320 (E.D.Wash.1994); and *Nelson v. Easley (In re Easley),* 72 B.R. 948 (Bankr.M.D.Tenn. 1987). "[A]ll 'different' treatments are not necessarily fair discrimination." *Easley,* 72 B.R. at 956.

In *Battista,* the court pointed out that the term "differently" in § 1325(b)(1) has "content separate from the proscription against unfair discrimination." *Battista* 180 B.R. at 357, quoting *Easley,* 72 B.R. at 956. The *Battista* court went on to find that a Chapter 13 plan which proposed to pay two unsecured co-signed creditors in full while paying other unsecured creditors a 6% dividend represented unfair discrimination. *Id.* at 357–58. Accordingly, the *Battista* court denied plan confirmation. *Id.*

In *Cheak,* the court applied the four-factor test for discrimination and determined that a debtor's Chapter 13 plan that proposed to pay unsecured debts co-signed by the debtor's spouse in full represented unfair discrimination. *Cheak* 171 B.R. at 57–58. The

---

**6.** The four factors include:
  (1) whether the discrimination has a reasonable basis;
  (2) whether the debtor can carry out a plan without such discrimination;
  (3) whether such discrimination is proposed in good faith; and
  (4) the treatment of the class discriminated against.
*In re Bradley,* 109 B.R. 182, 183 (Bankr.E.D.Va. 1990); *In re Cheak,* 171 B.R. 55, 58 (Bankr. S.D.Ill.1994); *In re Perkins,* 55 B.R. 422, 425–26 (Bankr.Okla.1985).

**7.** Specifically, *Dornon* quoted the legislative record surrounding the Congressional adoption of the relevant amendment to § 1322(b)(1):
  Although there may be no theoretical differences between co-debtor claims and others there are important practical differences that

must be recognized. Because codebtors are often relatives or friends, the debtor may feel a great need to pay the debt in full, even if that is not permitted within the Chapter 13 plan. If the debtor can be required to devote all disposable income to the plan, the conflicting desire to voluntarily make payments outside the plan on a co-signed debt may spell failure for the plan by leaving insufficient income to keep up plan payments. If, as a practical matter, the debtor is going to pay the codebtor claim, he should be permitted to separately classify it in Chapter 13.
*Dornon* at 64, *quoting* 5 Collier on Bankruptcy, ¶ 1322.05 at 1322–9 to 1322–10 (15th ed. 1989) (citing to S.REP. NO. 65, 98th Cong., 1st Sess., 17–18 (1983) [S. 445] ("Senate Report")) (internal quotations omitted).

*Cheak* court went on to voice concerns regarding the potential for abuse if debtors were arbitrarily permitted to shield their spouse's income by paying co-signed debts in full. *Id.* at 58. Since the debtor and his wife presumably pool their income for purposes of household expenses, "[t]he identity of interests between the debtor and his wife as co-signor distinguishes this case from one involving a co-signor who is a relative or close friend with a separate income." *Id.*

This Court agrees that the rationale and analysis of *Cheak* and *Battista* comports most closely with the intent of Congress and the underlying principles of Chapter 13 and the Bankruptcy Code. Permitting a debtor to arbitrarily differentiate between creditors based upon the co-signed status of a debt—without any further justification—is an invitation to abuse. Particularly in the circumstances of this case—where the debtor is co-signed with his spouse and that spouse has a significant income—permitting a different treatment of co-signed debts which may represent unfair discrimination appears to be antithetical to the intent, spirit and purpose of Chapter 13.

For illustration, consider the example where a Chapter 13 debtor pays 10% to general unsecured creditors, but 100% to unsecured creditors who have received the co-signature of a spouse. The spouse's income is effectively shielded with respect to the co-signed debts. In one scenario, the spouse may have no disposable income—all of her income being used to pay for living expenses or legitimate personal debts. At the other extreme, the spouse may have an abundance of disposable income, may be paying for high value luxury items, or may be protecting extensive property holdings. It would be difficult for this Court to look with favor on a debtor's plan which proposes to pay 10% to general unsecured creditors and 100% to co-signed unsecured creditors while the debtor's spouse makes payments on a Lambourghini. Additionally, absent some requirement for a demonstration of fair discrimination, a debtor could voluntarily co-sign any and all of the spouse's obligations immediately prior to bankruptcy, and apply a greater percentage of his disposable income

to paying those co-signed debts. The debtor's actions would unfairly reduce the percentage and total payment that the debtor's original creditors should receive.

This Court therefore adopts the analysis of *Cheak* and *Battista* which requires a debtor to demonstrate "fair" discrimination. Applying this analysis to Martin's plan, this Court must conclude that Martin has not successfully met his burden of demonstrating fair discrimination.

After deducting trustee's fees, Martin's proposed plan would pay two co-signed debtors 100% while paying approximately 6.5% to Mitchell and the other unsecured creditors. On the other hand, if all unsecured debts were treated equally, Mitchell's payment would increase to approximately 10.2%. Martin testified that separate classification of debts was necessary because his wife had separate, independent debts. Martin's plan reflects that his wife is responsible for half of the couple's monthly housing costs, and he testified that his wife paid for her own car. But Martin's plan also shows that his wife has an income nearly equal to his own, with no explanation as to the eventual use of the remainder of that income or why discriminatory classification to the extent noted in the plan is actually necessary and fair.

Based upon the current state of the record, this Court cannot confirm Martin's plan which proposes to pay 100% of those debts co-signed by his wife. Should Martin wish to separately classify his co-signed debts, then he must establish that such a classification does not represent unfair discrimination. Thus, absent further documentation or amendment, this Court must deny confirmation to Martin's plan on those grounds.

■ Mitchell's final objection to the Debtor's plan states that Martin has failed to provide for all of the debtor's net disposable income to be paid into the plan. Section 1325(b)(1) prohibits this Court from approving any plan—once objected to—unless *inter alia* that plan "provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B)

(West 1995). Mitchell asserts that Martin's plan fails to account for all of his disposable income, and thus, must be denied confirmation.

The Code defines "disposable income" as income that is received by the debtor which is not reasonably necessary "for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2) (West 1995). And if the debtor is engaged in business, disposable income includes that income not required for expenditures "necessary for the continuation, preservation, and operation of such business." *Id.*

After mature consideration of the testimony offered before this Court, and other evidence in the record, this Court concludes that Mitchell's objection on this ground must be sustained. Martin admitted that he was mistaken as to his hourly wage rate—believing that it was $14.50 per hour rather than the actual $14.80—and that he failed to specifically account for his mileage reimbursements. As stated earlier, Martin's income is not easily discernable, and although this Court declines to find a lack of good faith in Martin's submission, the presence of error is nonetheless evident. To be fair, this Court points out that evidence also demonstrated the existence of additional bills which were not originally included in Martin's plan. Thus, Martin's modified plan, while probably displaying an increase in total monthly income, will likely not demonstrate a significant increase in disposable income. But since Martin's current plan must be modified or further substantiated on other grounds, it is appropriate that the new plan should better reflect Martin's actual expected monthly income and expenses.

In conclusion, this Court finds that Martin's Chapter 13 plan was proposed in good faith. At the same time, this Court also finds that absent additional proof and justification, Martin's plan unfairly discriminates against unsecured creditors by paying 100% of the debts co-signed by Martin's spouse, while paying roughly 6% of other unsecured debts. This Court's ruling does not necessarily deny Martin the ability to so classify these debts, but simply requires a sufficient justification for doing so. Lastly, this Court finds that Martin's proposed plan does not accurately enough reflect the debtor's actual expected monthly income. For these reasons, Martin's plan should be denied confirmation.

An Order conforming with this Memorandum Opinion will be entered by the Court.