**In re Todd & Renea McKOWN, Debtors.**

**Bankruptcy No. 98–50893.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Sept. 23, 1998.

Michael J. Moran, for debtor.

David Hunter, for creditor.

## ORDER DENYING CONFIRMATION OF DEBTORS' AMENDED CHAPTER 13 PLAN

MARILYN SHEA–STONUM, Bankruptcy Judge.

This matter is before the Court on the Debtors' Chapter 13 Plan, the Amendment to Chapter 13 Plan, the Objection to Confirmation of Debtors' Amended Chapter 13 Plan filed by Valley Savings Bank (the "Bank") and the debtors' response. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a) and (b)(1) and by the Standing Order of Reference entered in this District on July 16, 1984.

### I. FACTS

#### A. Overview of the Debtors' Chapter 13 Plan.

On March 24, 1998, Todd and Renea McKown (the "Debtors") filed a petition for relief under chapter 13 of the Bankruptcy Code. On March 31, 1998, the Debtors filed their Chapter 13 Plan (the "Plan"), which provided for an estimated term of 48 months. The Plan proposed to pay 10% to holders of allowed unsecured nonpriority claims, with the exception that Navy Federal Credit Union ("Navy Federal"), as a creditor with a co-obligor, was to receive payment in full of its $9,888 unsecured claim.

On June 11, 1998, the Debtors filed an amendment to the Plan. The amendment extends the term of the Plan to a period of 60 months, with the result that unsecured creditors without co-obligors are to be paid approximately 33% of their allowed claims.

#### B. The Basis of the Navy Federal Debt.

The indebtedness to Navy Federal arose from the Debtors' purchase of real property in the Township of Mantua, Portage County, Ohio (the "Mantua Property"). The Debtors purchased the property jointly with Renea McKown's brother, Robert Tremont. The total purchase price for the Mantua Property was $55,000. The Debtors financed the purchase using the proceeds of a loan from Park View Federal Savings Bank ("Park View"), which is secured by the Mantua Property, an unsecured loan from Navy Federal and funds contributed by Mr. Tremont. Mr. Tremont co-signed the loan from Navy Federal.

After obtaining title to the Mantua Property, the Debtors and Mr. Tremont divided the property and had it separately titled, thereby creating two legally distinct parcels. As of June 1998, Mr. Tremont was constructing a residence on his separately titled parcel of the Mantua Property. The Debtors do not live on their parcel of the Mantua Property (the "Debtors' Parcel") but have a residence elsewhere.

#### C. The Debtors' Disposable Income Calculation

Schedule J to the Debtors' Schedules of Assets and Liabilities, as amended in June 1998, includes a payment in the amount of $133 per month with respect to the secured loan of Park View which encumbers the Debtors' Parcel. Schedule J also includes an expenditure in the amount of $1,449 per month with respect to the first and second mortgages for the Debtors' residence. Based on these and other expenditures, Schedule J states that the Debtors have disposable income of approximately $655 per month which the Debtors propose to pay into the Plan.

#### D. The Equity in the Debtors' Parcel

Schedule A to the Debtors' Schedules states that the Debtors' Parcel has a current market value in the amount of $27,500, which is half the purchase price for the Mantua Property. According to Schedule D, Park View has a $13,800 claim secured by the Debtors' Parcel. Consequently, there is considerable equity in the Debtors' Parcel. Based on the Debtors' Schedules, the Debtors have only one other asset which would generate any proceeds for their creditors if liquidated: a 1986 Yamaha with a stated current market value of $2,500. Pursuant to O.R.C. § 2329.66(A)(2), the Debtors claim a $1,000 exemption for the 1986 Yamaha.

## II. LAW

### A. The Amended Plan Satisfies Section 1325(a)(4) of the Bankruptcy Code.

Section 1325(a)(4) of the Bankruptcy Code provides that property to be distributed on account of each allowed unsecured claim under a chapter 13 plan must have a value, as of the effective date, which is not less than the amount that would be paid on such claim if the debtor's estate were liquidated under chapter 7. The amended Plan satisfies this requirement for confirmation.

The amended Plan provides for 60 monthly payments in the amount of $655 per month. This results in aggregate distributions paid through the trustee in the amount of $39,300.[1] From this figure, the following payments will be made: (1) $12,700 to be paid to two secured creditors—a creditor secured by personal property (computer, stereo, etc.) and a creditor secured by an automobile; (2) $900 to be paid in attorneys' fees; (3) $3,560.06 to be paid for trustee's fees; and (4) $9,888 to be paid to Navy Federal. Funds in the amount of $12,251.94 remain to be distributed to general unsecured creditors (including the deficiency claims of secured creditors). The aggregate debt of unsecured creditors (excluding Navy Federal) consists of $12,318 in deficiency claims and $24,387 in unsecured claims. Consequently, under the amended Plan, general unsecured creditors will receive approximately a 33% distribution.

In a liquidation, creditors, including Navy Federal, would receive approximately 28% of their unsecured claims. The Debtors have only two assets with equity over and above the Debtors' claimed exemptions: the Debtors' Parcel and a 1986 Yamaha. The Debtors' Schedule A states that the Debtors' Parcel has a current market value in the amount of $27,500 (this equals half the Mantua Property's purchase price before it was divided between the Debtors and their co-debtor,

Mr. Tremont).[2] According to Schedule D, Park View has a $13,800 claim secured by the Debtors' Parcel. The 1986 Yamaha has a stated current market value of $2,500. Pursuant to O.R.C. § 2329.66(A)(2), the Debtors claim a $1,000 exemption for the 1986 Yamaha.

■ Using conservative estimates of 7% costs of sale for the Debtors' Parcel (6% commission plus 1% other costs of sale) and 5% costs of sale for the Yamaha, these assets will generate $13,150 for distribution to all unsecured creditors. With total unsecured debt in the amount of $46,593 (consisting of $12,318 in deficiency claims, $24,387 in unsecured claims and $9,888 in the unsecured claim of Navy Federal), unsecured creditors would receive approximately 28% of their claims in a chapter 7 liquidation (although presumably unsecured creditors would receive such a distribution in less than five years). This is less than the approximately 33% distribution to be paid to general unsecured creditors under the amended Plan. Even taking into account the five-year period over which unsecured claims will be paid pursuant to the amended Plan, the amended Plan satisfies section 1325(a)(4) of the Bankruptcy Code by providing unsecured creditors with a distribution under the amended Plan having a value as of the effective date that is no less than they would receive if the Debtors' estate were liquidated under chapter 7.

### B. The Amended Plan Satisfies Section 1325(b)(1)(B) of the Bankruptcy Code.

Section 1325(b)(1) provides in pertinent part that, if a holder of an allowed unsecured claim objects to the confirmation of a plan, then the court may not approve the plan, unless, as of the effective date of the plan, "the plan provides that all of the debtor's projected disposable income to be received in

---

1. The Debtors' Schedule J includes the monthly mortgage payments owed with respect to the Debtors' residence and the Debtors' Parcel. Pursuant to the amended Plan, the Debtors are paying these secured claims directly; these secured claims are not paid from the $39,300 to be provided to the trustee.

2. This method of valuing the Debtors' Parcel appears conservative, as the Debtors purchased the Mantua Property in 1996 and the value is likely to have increased since that time. However, this Court has been provided with no evidence that contradicts the value of the Debtors' Parcel which is set forth in the Debtors' Schedules.

the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B). The amended Plan satisfies this requirement for confirmation.

■■■ With respect to the Debtors' amended Schedule J, the Court was initially concerned with the payment of $133 per month for the mortgage which encumbers the Debtors' Parcel. Given that the Debtors do not reside at the Debtors' Parcel, this payment is not reasonably necessary for the maintenance or support of the Debtors. *See, e.g., In re Dick,* 222 B.R. 189, 190 (Bankr. D.Mass.1998) (holding that mortgage payments on vacation house are disposable income); *In re Lindsey,* 122 B.R. 157, 158 (Bankr.M.D.Fla.1991) (holding that mortgage payments on 40 acre parcel of investment property constituted disposable income). However, the amended Plan is for a period longer than 36 months. The Debtors' aggregate payments under the amended Plan ($39,300) are greater than the aggregate payments which would be made if Schedule J omitted this mortgage payment and the Debtors made plan payments for merely 36 months ($28,368). Moreover, even if the payments made to creditors under a hypothetical three-year plan (which omitted the $133 per month mortgage payment) were safely invested and generated 3.5% interest per year during years four and five, the resulting aggregate value of $30,388.51 in plan distributions is less than unsecured creditors will receive within five years under the amended Plan. Consequently, the amended Plan satisfies section 1325(b)(1) of the Bankruptcy Code. *See In re Gonzales,* 157 B.R. 604, 612–13 (Bankr.E.D.Mich.1993).

C. *The Treatment Afforded Navy Federal Under the Amended Plan Constitutes Unfair Discrimination.*

1. *The Legislative History to Section 1322(b)(1) of the Bankruptcy Code*

Section 1322(b)(1) provides that a plan may:

designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims.

11 U.S.C. § 1322(b)(1). As originally enacted in 1978, section 1322(b) permitted a chapter 13 debtor to designate classes of unsecured claims if two conditions were satisfied: that the classification be "as provided in section 1122"[3] and that the classification "not discriminate unfairly". Pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984) ("BAFJA"), section 1322(b) was amended to explicitly authorize treatment of unsecured, co-signed consumer obligations which differs from the treatment of general unsecured claims.

Neither the Senate nor House reports for BAFJA contain any reference to section 1322(b). Rather, this portion of the amendment derives from a prior bill whose language was partially incorporated into BAFJA. Thus, the only legislative history is that contained in the Senate report for that earlier bill, the Omnibus Bankruptcy Improvements Act of 1983, S.445, 98th Cong., 1st Sess. (1983). *In re Strausser,* 206 B.R. 58, 59 (Bankr.W.D.N.Y.1997). That Senate report states as follows:

Although there may be no theoretical differences between codebtor claims and others, there are important practical differences. Often, the codebtor will be a relative or a friend, and the debtor feels compelled to pay the claim. If the debtor is going to pay this debt anyway, it is important that this fact be considered in determining the feasibility of the plan. Sometimes, the codebtor will have posted collateral, and the debtor will feel obligated to make the payment to avoid repossession of the collateral. In still other cases, the codebtor cannot make the pay-

---

**3.** Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

ment, and the effect of nonpayment will be to trigger a Chapter 7 or Chapter 13 petition by the co-debtor, which may have a ripple effect on other parties as well. For these reasons, separate classification is often practically necessary.

S.Rep. No. 65, 98th Cong., 1st Sess., 17–18 (1983) [S.445].

Some courts have expressed the view that the 1984 amendment to section 1322(b) eliminated the prohibition against "unfair discrimination" in the context of separately classified obligations "incurred for consumer needs." *In re Riggel*, 142 B.R. 199, 204 (Bankr.S.D.Ohio 1992); *In re Dornon*, 103 B.R. 61, 64 (Bankr.N.D.N.Y.1989) (reading the "exception" at least as broadly). However, this Court joins the interpretation of numerous courts which have determined that the option of providing "different" treatment to a co-signed, unsecured consumer obligation does not mean that a debtor has been dealt a wild card that automatically permits the debtor to discriminate unfairly against his or her general unsecured creditors when doing so. *See, e.g., In re Martin*, 189 B.R. 619, 628 (Bankr.E.D.Va.1995); *In re Battista*, 180 B.R. 355, 357 (Bankr.D.N.H. 1995); *In re Cheak*, 171 B.R. 55, 57 (Bankr. S.D.Ill.1994); and *In re Easley*, 72 B.R. 948, 956 (Bankr.M.D.Tenn.1987). Moreover, it is the debtor's burden to demonstrate that the proposed discrimination is fair. *Martin*, 189 B.R. at 628 ("[s]hould [the debtor] wish to separately classify his co-signed debts, then he must establish that such discrimination does not represent unfair discrimination"); *Battista*, 180 B.R. at 358; *Cheak*, 171 B.R. at 58 ("[t]he debtor who seeks to discriminate in favor of a co-signed claim has the burden of showing that such discrimination is fair").

2. *Examining the Debtor's Motivation to Pay Outside of the Plan as a Basis for Separate Classification.*

In light of the legislative history to the amendment of section 1322(b)(1), courts

have refused to confirm a plan when general unsecured claims are treated differently than a co-signed obligation and the disparate treatment is not required to discourage a debtor from making out-of-plan payments.[4] In this case, the objector argues that if the Debtors did not primarily or solely benefit from the co-signed obligation, discriminatory treatment in favor of a co-signed obligation is not acceptable. This clarification of section 1322(b)(1), as amended in 1984, has been accepted by other courts. *Battista*, 180 B.R. at 358 (holding that debtor had to establish that co-signed obligations "were incurred for her benefit as opposed to the benefit of the cosigner" in order to separately classify co-signed debt). The debtor will feel no moral obligation to pay a codebtor claim outside of a chapter 13 plan when the debtor was not the sole or primary beneficiary of the co-signed debt at issue. *In re Gonzales*, 172 B.R. 320, 329–30 (E.D.Wash.1994) (holding that separate classification of co-signed obligations under section 1322(b)(1) is limited to co-signed debt acquired for the benefit of the debtor, not the co-signer).

3. *Examining the Financial Impact of Nondiscriminatory Treatment on the Codebtor.*

Courts also evaluate whether or not the proposed discriminatory treatment is required to prevent financial hardship to the codebtor. If the codebtor is unlikely to suffer as a result of the debtor's nonpayment of a co-signed obligation, discrimination in favor of the codebtor has been held to constitute unfair discrimination. For example, in *In re Thompson*, 191 B.R. 967 (Bankr.S.D.Ga. 1996), the court denied confirmation of a plan which proposed to pay a debt co-signed by the debtor's mother in full but provided that general unsecured creditors would receive nothing. The debtor's mother had pledged

---

4. For example, courts have refused to approve plans in which the claims of general unsecured creditors received *more* favorable treatment than co-signed consumer debt. *In re Davis*, 101 B.R. 505, 507 (Bankr.S.D.Ohio 1989) ("while § 1322(b)(1) permits discrimination against general unsecured claimants to protect a debtor's co-signors, this Court's reading of § 1322(b)(1)

does not reveal any intent or purpose to prefer general unsecured creditors over those holding co-signatures"); *In re Diaz*, 97 B.R. 903, 905 (Bankr.S.D.Ohio 1989) ("Neither law nor logic supports a construction of § 1322(b)(1) which would allow less favorable treatment for co-signed claims than that accorded to other unsecured claimholders.").

an \$80,000 certificate of deposit to secure the co-signed obligation; the certificate of deposit well exceeded the amount of the debt. In denying confirmation, the court noted that:

> the hardship to the cosigner in having to honor her guarantee appears to be minimal. The collateral posted by the cosigner is liquid and more than sufficient to satisfy any deficiencies in repayment on the Bank's claim.... [I]t is clear from the collateralization of the codebtor's obligation that the codebtor has ample financial resources to fund the payment of the codebtor claim which would remain unpaid if all unsecured creditors were treated equally in this case. Thus the threat of a "ripple effect" is not present.

*Id.* at 974.

In contrast, in *In re Janssen,* 220 B.R. 639 (Bankr.N.D.Iowa 1998), the court approved discriminatory treatment which favored obligations co-signed by the debtor's father. Although general unsecured creditors would receive a 40% distribution, the five-year plan proposed to pay obligations which were co-signed by the debtor's father in full. The debtor's father was a 73–year old retired farmer and was not in good health. Although the father could pay the co-signed obligations, "it would place him in a tight financial position." *Id.* at 645. Given that the co-signed obligations were incurred for the debtor's benefit, that the debtor's father could not easily fund the payments on the co-signed debt and that the debtor's plan provided significantly more to general unsecured creditors than they would receive in a chapter 7 liquidation, the court determined that payment of the co-signed obligations in full was acceptable.[5]

4. *The Court's Continuing Discretion in Evaluating Discriminatory Treatment Under Section 1322(b)(1).*

Because a plan must be proposed in "good faith" and the discrimination in favor of co-signed obligations cannot be "unfair", courts need not approve treatment which favors a codebtor. Although a debtor can separately classify co-signed, consumer debts, the debtor does not have free rein to ignore the concerns of general unsecured creditors when doing so. Consequently, even though discriminatory treatment might discourage out-of-plan payments and/or prevent financial hardship to a codebtor, courts have refused to sanction discriminatory treatment in varying circumstances.

For example, in *Cheak,* the court denied confirmation of a chapter 13 plan which proposed to pay a debt co-signed by the debtor's wife in full, while paying as little as 10% of the claims of general unsecured creditors. The court explained its rationale as follows:

> [I]n this case the codebtor is the debtor's wife, who has not joined the debtor in his Chapter 13 proceeding. The separate income of the debtor's wife presumably benefits the debtor to the extent they, as a married couple, pool their income for household expenses. Thus, if the debtor were permitted to pay 100% of this co-signed claim through his Chapter 13 plan, he would protect his wife's income and thereby benefit himself at the expense of other unsecured creditors.... The debtor would benefit indirectly from his proposed 100% payment of the [co-signed] claim, and this treatment, therefore, would not be fair to other unsecured creditors who would receive as little as 10% of their claims.

*Cheak,* 171 B.R. at 57. *See also Martin,* 189 B.R. at 628 (denying confirmation of chapter 13 plan which proposed to pay 100% of debts co-signed by debtor's wife but to pay only 6.5% to general unsecured creditors; "where the debtor is co-signed with his spouse and that spouse has a significant income—permitting a different treatment of co-signed debts which may represent unfair discrimination appears to be antithetical to the intent, spirit and purpose of Chapter 13").

In *Easley,* the court refused to confirm a plan which proposed to pay a co-signed debt in full but would pay only 12% of a debt which would be nondischargeable outside of a

5. The plan also proposed to pay post-petition interest on the co-signed obligations. Because the court held that the claims of these creditors did not include post-petition interest, the court conditioned confirmation on the debtor amending the plan to eliminate the payment of post-petition interest to these creditors. 220 B.R. at 645–46.

chapter 13 case. The debt arose from the debtor's assault of a guard while he was under arrest and in custody. The court determined that "it is unfair to discriminate against the victim of the debtor's prepetition misconduct." *Easley*, 72 B.R. at 956.

In this case, the proposed discrimination in favor of Navy Federal does not appear to further the goals of the amendment to section 1322(b)(1). First, the favorable treatment to be afforded to Navy Federal under the amended Plan appears unnecessary to prevent the Debtors from making out-of-plan payments on the co-signed obligation. Although the Debtors were beneficiaries of the Navy Federal loan, the codebtor also benefitted, by obtaining property on which he intended to reside. Therefore, the element of moral compulsion which might pressure a debtor to make out-of-plan payments is minimized, if not eliminated, in this instance. Second, the Debtors have failed to demonstrate that the codebtor cannot afford to make the payments for the Navy Federal loan. The Debtors, who have the burden of proof on this issue, have provided no evidence that, absent the discriminatory treatment, the codebtor will experience some financial hardship. Therefore, the discriminatory treatment has not been shown to promote the second goal of the amendment to section 1322, *i.e.*, the avoidance of a "ripple effect." Lastly, the Court cannot ignore the effect of sanctioning the discriminatory treatment proposed here. It is simply unreasonable to allow the Debtors to preserve property at which they do not reside at the expense of their general unsecured creditors, here that expense being the time value of money. Because of the proposed 100% payment to Navy Federal, creditors must wait five years under the amended Plan to receive 33% of their unsecured claims. The discrimination in the amended Plan is thus unfair and violates section 1322(b)(1), rendering the amended Plan unconfirmable pursuant to section 1325(a)(1) of the Bankruptcy Code.[6]

Based upon the foregoing analysis, the Court hereby determines that confirmation of the amended Plan must be, and the same is hereby, denied.

**IT IS SO ORDERED.**

---

**6.** The challenge presented by this matter is to deduce the meaning of section 1322(b)(1) after its amendment in 1984. The "plain" language of the statute does not permit unfair discrimination in favor of the obligor on a co-signed consumer debt, but it does sanction different treatment of such obligations. On the facts of this case, for instance, in order to eliminate the unfair discrimination currently proposed, and yet pay Navy Federal's unsecured claim in full, the Plan could be further amended to provide that all unsecured creditors, including Navy Federal, will receive pro rata payments until all creditors have received 33% of their allowed unsecured claims. For the remainder of the Plan's five-year term, Navy Federal could receive the balance of the monthly payment which remains after payment of administrative and secured claims. This would enable Navy Federal to receive 100% of its allowed unsecured claim within five years. In this manner, unsecured creditors need not wait an excessive period of time to receive a meaningful distribution under the Plan, and the Debtors' co-obligor, Mr. Tremont, could receive the benefit for which section 1322(b)(1) provides, as well as the protection of the codebtor stay.