**In re Blake S. THOMPSON, Kimberly Thompson, Debtors.**

**Bankruptcy No. 95–50105.**

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Jan. 25, 1996.

Mary Jane Cardwell, Waycross, Georgia, for debtors.

Karrollanne Cayce, Chapter 13 Trustee's Office, Savannah, Georgia, for trustee.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on confirmation of Blake and Kimberly Thompson's (collectively "Debtors") Chapter 13 plan of reorganization. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(L). The Court publishes the following findings of fact and conclusions of law in anticipation of a future hearing to be conducted in accordance with this memorandum opinion.

### FINDINGS OF FACT

First National Bank of Alma (the "Bank") has filed a proof of claim in this case for $28,729.72. The Bank's claim is secured by a 1983 mobile home and real property valued together at $11,000.00 as well as a 1988 Ford Ranger pickup truck valued at $2,000.00. Thus, the Bank holds a secured claim for $13,000.00 and an unsecured claim for $15,729.72.

Debtors' financial obligation to the Bank is also secured by a co-signor, Blake Thompson's mother, who has pledged to the Bank a certificate of deposit for $80,000.00 as security for her personal liability. Debtors have proposed to separately classify the Bank's claim for payment in full while paying nothing to any of Debtors' other unsecured creditors. Such unpaid claims total $15,587.71.

At the hearing on confirmation of Debtors' plan, the Court expressed a concern that the classification scheme contemplated in Debtors' plan might be unfair with regard to the remaining unsecured creditors. Debtors asserted that pursuant to 11 U.S.C. § 1322(b)(1) considerations of fairness are irrelevant in a claims classification scheme where the separately classified claim is a cosigned debt.

### CONCLUSIONS OF LAW

██ The primary issue to be addressed is whether unfair discrimination would prevent confirmation where an unsecured cosigned claim is separately classified for full payment while other unsecured creditors receive no distribution on their claims. Claims classification in a Chapter 13 plan is governed by section 1322(b)(1) of the Bankruptcy Code, which provides in pertinent part:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
> (1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims;

11 U.S.C. § 1322(b)(1) (West 1995).

Debtors urge the Court to adopt an interpretation of section 1322(b)(1) which provides that a Chapter 13 plan may designate a class of unsecured cosigner claims without regard to the prohibition against unfair discrimination. Under Debtors' interpretation, the term "however" causes Debtors' entitlement to separately classify a codebtor liability to be exempt from the unfair discrimination prohibition contained in the first sentence of the Code section. After a review of the relevant case law, statutes and legislative history associated with section 1322(b)(1), the Court is unable to identify a clear consensus of authority on the issue.

The legislative history of section 1322(b)(1) reveals that Congress carefully considered the policy implications of classification, and intended to allow separate classification and treatment of cosigned consumer debt. The ability to separately classify debt is intended to serve as an incentive to debtors to reorganize rather than liquidate. Prior to the 1984 amendments, courts were reluctant to allow separate classification of codebtor claims. Courts allowed special classification where the debtor showed the need for a continuing

relationship with a creditor postbankruptcy.[1] While debtors could make such a showing in the case of doctors or suppliers, they had a more difficult time in the case of codebtors.[2] This lead many debtors to choose liquidation rather than reorganization.

Congress realized that disallowing separate classification of claims would doom many reorganization efforts from the start as evidenced by the following legislative history:

> A number of cases have considered whether claims involving co-debtors may be classified separately from other claims. Thus far, the majority of cases have refused to permit such classification on the ground that codebtor claims are not different than other claims. [citations omitted].
>
> Although there may be no theoretical differences between codebtor claims and others, there are important practical differences. Often, the codebtor will be a relative or friend, and the debtor feels compelled to pay the claim. If the debtor is going to pay the debt anyway, it is important that this fact be considered in determining the feasibility of the plan. Sometimes, the codebtor will have posted collateral, and the debtor will feel obligated to make the payment to avoid repossession of the collateral. In still other cases, the codebtor cannot make the payment, and the effect of nonpayment will be to trigger a chapter 7 or chapter 13 petition by the codebtor, which may have a ripple effect on other parties was well. For these reasons, separate classification is often practically necessary.
>
> Courts under both the present Act and the former law have emphasized that plans must be realistic. For example, courts have refused to confirm plans which the debtor could not possibly perform; have insisted on realistic estimates of expenditures; and have considered debts which the debtor proposes to pay outside the plan in determining feasibility. [citation omitted]. This approach is eminently sensible. No purpose is served by confirming a plan which the debtor cannot perform.

If, as a practical matter, the debtor is going to pay the codebtor claim, he should be permitted to separately classify it in a chapter 13. A result which emphasizes purity in classifying claims does so at the price of a realistic plan. Neither debtors nor creditors benefit from such a rigid approach, and the Committee has determined that statutory authority to separately schedule such debts will contribute to the success of plans contemplating repayment of same. Accordingly, this authority is provided for in the proposed bill by amendment to section 1322(b)(1).

S.Rep. No. 65, 98th Cong., 1st Sess., pp. 17–18 (1983).

However, Congress was mindful of the potential abuse of separate classification as indicated by the following:

> Under old law, the practice under old law was for debtors to file a liquidation case, and then reaffirm on codebtor claims to protect the codebtor, so that the codebtor claim survived under old law, and the other claims were wiped out.
>
> The idea of the stay of collection of codebtors was to encourage paying all the debts and not just debts that are cosigned, so to the extent that we permit separate classification of those claims under new law, we may be going contrary to the spirit and the intent of the stay against collection of codebtors.

A & P Hearings on P.L. 98–353, 97th Cong., 1st and 2nd Sess., p. 174 (1981–1982).

Thus, Congress was concerned that the separate classification of debts would undermine the purpose of a repayment plan if the classification resulted in only the cosigned debt being repaid. In reality, this is no different from the liquidation case where the cosigned debt is reaffirmed and the remaining claims are discharged. The concern was for allowing a debtor to avail himself of the more liberal discharge provisions of Chapter 13 where the effect of the reorganization was no different than a liquidation in terms of payment.

---

**1.** Morris, Substantive Consumer Bankruptcy Reform In The Bankruptcy Amendments Act Of 1984, 27 Wm. & Mary L.Rev. 91 (1985).

**2.** *Id.* at 143–144.

■ In the conflict of policy, Congress sacrificed complete equality of claims repayment in favor of an approach which considered the reality of a debtor's motivations, and tailored the Code to encourage a debtor to choose reorganization. It is clear, therefore, that Congress intended to allow separate classification of codebtor debts and different degrees of payment to each unsecured class in such a case. This, however, does not explicitly answer the question of whether cosigner debts may be separately classified without regard to the notion of fairness as to other classes of creditors.

Whether unfair discrimination is an obstacle to separate classification of cosigned debt is still a matter of dispute. The plain language of the statute provides that separate classification is contemplated. However, it is unclear whether section 1322(b)(1) merely relieves a debtor from having to show the special need for a continuing postbankruptcy relationship as required under the former Bankruptcy Act,[3] or whether, in addition, codebtor claims are exempt from the requirement that separate classifications not unfairly discriminate. In order to answer this question, the Court must review the term "unfair discrimination" and what it means in the context of separate classification of co-debtor claims.

"Unfair discrimination" is not defined in the Bankruptcy Code. As a result, courts have developed a four part test to determine if a classification discriminates unfairly. The most recognized test for unfair discrimination was enunciated by the court in *In re Wolff*, 22 B.R. 510 (9th Cir. BAP 1982) as follows:

(1) whether the discrimination has a reasonable basis;

(2) whether the debtor can carry out a plan without the discrimination;

(3) whether the discrimination is proposed in good faith; and

(4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination.

*Id.* at 512 (*citing In re Kovich*, 4 B.R. 403 (Bankr.W.D.Mich.1980) and *In re Dziedzic*, 9 B.R. 424 (Bankr.S.D.Tex.1981)).

The Court finds this test to be of little help in the present case. The difficulty lies in the fact that this test does not account for the special treatment Congress allowed in the case of cosigned debts. For example, the first part of the test is satisfied by reference to the legislative history in the case of codebtor claims. Discrimination in favor of codebtor claims is now a per se reasonable basis for separate classification. Additionally, the test is supplemented by the majority of courts by reference to the legislative history of section 1322(b)(1). Such courts require that the cosigned obligation be for the debtor's benefit, as opposed to benefitting a third party. *See e.g. In re Lewman*, 157 B.R. 134 (Bankr.S.D.Ind.1992). Moreover, in application the above four parts often amount to no more than a test for reasonableness. *In re Brown*, 152 B.R. 232, 235–238 (Bankr.N.D.Ill. 1993); *Lawson v. Lackey (In re Lackey)*, 148 B.R. 626, 631 (Bankr.N.D.Ala.1992).

While there is a substantial disagreement among the courts as to whether unfair discrimination is a basis on which to reject codebtor classifications,[4] the disagreement is largely a matter of semantics. "Unfair discrimination" as defined does not have any application independent of existing confirmation requirements. Courts which hold that unfair discrimination applies to codebtor classifications often find unfair discrimination by reference to a failure to satisfy the other confirmation requirements of section 1325. *See e.g. In re Battista*, 180 B.R. 355 (Bankr. D.N.H.1995); *Matter of Gonzalez*, 73 B.R. 259 (Bankr.D.P.R.1987).

■ Due to the changes in the Bankruptcy Code, the four part *Wolff* test for unfair discrimination is no longer of any significant assistance in the case of codebtor claims, and yet no consensus has emerged on an approach to replace the test. While the Court is hesitant to advocate replacing one test with another, the following analysis is a summation of the law as it appears to be estab-

---

3. *See supra.* at n. 1–2.

4. *Compare In re Dornon*, 103 B.R. 61 (Bankr. N.D.N.Y.1989) with *In re Cheak*, 171 B.R. 55 (Bankr.S.D.Ill.1994).

lished in the wake of the 1984 amendments to section 1322:

(1) Does the obligation fall under the plain language of section 1322(b)(1)?

This question is answered by showing that the obligation was a consumer debt in which the debtor is liable with another party.

(2) Was the debtor the beneficiary of the obligation or was the obligation incurred primarily for the benefit of the codebtor or some other third party?

The legislative history of section 1322(b)(1) indicates that Congress was concerned that a debtor would feel the moral obligation to protect family or friends who had obligated themselves for the debtor's benefit. The repayment of such a debt might be outside the plan, and therefore jeopardize the reorganization effort. The same moral obligation does not exist when the debtor is not the beneficiary of the obligation. Also, Congress was concerned that the failure of a debtor to completely pay off a cosigned obligation would lead to a "ripple effect" driving codebtors into bankruptcy as the creditor looked to the cosigner for satisfaction of any debt unpaid under the plan. *Lewman,* 157 B.R. at 137. This presumes that the debtor would be primarily liable, and that the creditor would turn to the codebtor only in the event that the debtor fails to pay. Most courts already require that the debtor be the beneficiary of the obligation in order to separately classify the debt for disparate treatment. This, therefore, is nothing more than a restatement of existing law.

(3) Does the plan satisfy other applicable confirmation standards as stated in section 1325 of the Code?

■ The ability of a debtor to separately classify debts does not eclipse other applica-

ble confirmation requirements. The requirements for confirmation of a plan are contained in section 1325 of the Bankruptcy Code, and form the nucleus of the Court's inquiry. If the result of a debtor's classification scheme is that the debtor is unable, for example, to provide all unsecured creditors with at least as much as they would have received under Chapter 7, the plan is not confirmable with the separate classification.[5] The Court must consider whether the plan would be feasible with the separate classification,[6] and whether the debtor has committed his available disposable income to repayment of his debts.[7]

■ Of particular importance is the requirement that the debtor pursue the separate classification in a good faith effort to reorganize, and not simply as a means of preferring certain creditors at the expense of others. 11 U.S.C. § 1325(a)(3). The good faith requirement of section 1325(a)(3) stands in sharp contrast to other confirmation standards such as the hypothetical liquidation test of section 1325(a)(4). The former is subjective while the latter is mathematical. The good faith requirement is a flexible concept which takes the measure of a debtor's plan to see if it appears to satisfy the most compelling of the various objectives which compete for priority. These competing objectives swirl like a whirlwind around many chapter 13 cases, urging values which within a case are often impossible to reconcile with precision.

A debtor's good faith is already the subject of extensive case law. The case of *Kitchens v. Georgia Railroad Bank and Trust Co. (In re Kitchens),* 702 F.2d 885 (11th Cir.1983) provides a nonexhaustive list of relevant factors to consider when a court rules on a debtor's good faith.[8] While not every ele-

**5.** 11 U.S.C. § 1325(a)(4).

**6.** 11 U.S.C. § 1325(a)(6).

**7.** 11 U.S.C. § 1325(b).

**8.** The court in *Kitchens* considered the following factors as relevant to good faith:
(1) the amount of the debtor's income from all sources;
(2) the living expenses of the debtor and his dependents;

(3) the amount of attorney's fees;
(4) the probable or expected duration of the debtor's Chapter 13 plan;
(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;
(6) the debtor's degree of effort;
(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;
(8) special circumstances such as inordinate medical expense;

ment of the *Kitchens* test is apt to be relevant in any particular case, a separate classification may cause an otherwise confirmable plan to run afoul of one or more of the *Kitchens* factors.

■ In the context of separate classification of creditors under Chapter 13, good faith is found where a debtor uses a classification scheme in a manner which is consistent with Congressional intent. In this sense, the factors enunciated by the *Wolff* court are still relevant, and yet not in the strict sense of a comparison between the distributions among classes of creditors.

■ The *Wolff* court's reference to "necessity" as a factor, present to a greater or lesser degree in each element of the test, bears upon the good faith usage of classification. Congress wished to prevent a "ripple effect" of bankruptcy filings by protecting cosignors which would be plunged into bankruptcy themselves if the debt were not paid by the debtor. Where that possibility is not present, separate classification may not satisfy Congressional intent and the good faith of a debtor is called into doubt.

■ Additionally, the Court may inquire as to whether the Chapter 13 plan is nothing more than a Chapter 7 liquidation case in disguise. If there is no distribution to unsecured creditors and the co-signed debt is to be paid in full, this is no different than the reaffirmation and liquidation which Congress intended to prevent by allowing separate classification. In such a case, usage of a classification scheme may be nothing more than a contrived abuse of the system which attempts to partake of the benefits Congress provided without shouldering the associated burdens of a good faith effort towards debt repayment.

■ The inducement which separate classification provides presumes that there would be *some* benefit to unsecured creditors by the debtor's choice of the Chapter 13 alternative. If the effect of a Chapter 13 plan is identical to liquidation the rationale of the inducement is hopelessly vacant. There may be cases where a zero distribution to unsecured creditors is appropriate, such as where separate classification is the only way of preventing the cosigner from having to file for bankruptcy protection herself. Determinations regarding a debtor's good faith must be made considering the financial condition of the cosigner as well as the end result of the classification.

Congress intended to allow some kind of separate classification and treatment of cosigned debt. The pre-amendment test for discrimination does not take this intent into account, and is subject to criticism for being little more than a redundant test of reasonableness. *Brown* at 235–238; *Lackey* at 631. This Court concludes that it is possible to take into account legislative intent without relying on the four part test enunciated in the *Wolff* decision.

Whether the reason for denying confirmation is unfair discrimination or failure to comply with section 1325 is irrelevant as a matter of practice. The elements of the various tests applied by courts may be collapsed as a matter of application into the requirements of good faith and compliance with legislative intent. In this light, unfair discrimination does not exist as a separate inquiry to be undertaken in addition to the other elements of confirmation.

A debtor's ability to separately classify cosigned debts is conditioned upon the debtor satisfying the basic elements of section 1322(b)(1) while staying within the constraints of the Code as a whole, to wit: a consumer debt, cosigned for the debtor's benefit, the separate classification of which does not jeopardize other required elements for confirmation as contained in section 1325.

Evidence has been presented in this case to demonstrate that the amount the Debtors propose to pay into this plan satisfies the "best effort" requirement. That narrows the issues in this case to one question, whether

---

(9) the frequency with which the debtor has sought relief under the [Bankruptcy Code] and its predecessors;
(10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors;
(11) the burden which the plan's administration would place on the trustee.
*Id.* at 888–889.

the allocation of the payments in favor of the codebtor claim and away from the other claims in this case satisfies the good faith test. At the hearing on this matter, the Court was concerned with the fact that the hardship to the cosigner in having to honor her guarantee appears to be minimal. The collateral posted by the cosigner is liquid and more than sufficient to satisfy any deficiencies in repayment on the Bank's claim. If the application of the good faith requirement causes the debtor to be unable to protect the codebtor from financial ruin, the prospect for such an occurrence is suggested in the legislative history to be one of the considerations for allowing the codebtor claim to be treated "differently." That factor is not present in this case, since it is clear from the collateralization of the codebtor's obligation that the codebtor has ample financial resources to fund the payment of the portion of the codebtor claim which would remain unpaid if all unsecured creditors were treated equally in this case. Thus, the threat of a "ripple effect" is not present.

■ Additionally, this case appears to be nothing more than a Chapter 7 liquidation and reaffirmation in disguise. Debtors propose to pay the cosigned debt in full while providing nothing for the remaining unsecured creditors. Thus, Debtors attempt to reap the benefits of Chapter 13 repayment without the corresponding burden of a good faith effort towards debt repayment.[9] If a debtor is going to propose full payment of a cosigned debt and a zero distribution to other unsecured creditors, absent other factors, the fact that the classification is not necessary to prevent the cosigner's financial ruin weighs heavily against the debtor's good faith. Both of these considerations, though not exhaustive or determinative, serve as red flags which a debtor would do best to avoid.

This analysis might be different if the other unsecured creditors were receiving a dividend which was more substantial. If, for example, the codebtor claim was to receive one hundred percent while the other unsecured claims were receiving a substantial distribution, it is more likely that good faith would be satisfied because separate classification was created to encourage such repayment. This fact, coupled with a real necessity on Debtors' part to protect the cosigner from financial ruin would bring this case squarely within Congressional intent regarding the use of classification, and would also satisfy good faith. There is, of course, no magic percentage of repayment which will determine good faith in any particular case. This case represents the most extreme example, providing no repayment at all to the remaining unsecured creditors.

■ Even in the absence of objection from unsecured creditors, the bankruptcy court must find that the requirement for good faith has been satisfied. 11 U.S.C. § 1325(a)(3). The zero distribution proposed by Debtors in this case cannot be said to satisfy the good faith requirement. The Court would be more likely to accept a disparity in the distribution percentage between

9. Congress intended to encourage debtors to file Chapter 13 rather than Chapter 7. "The reasons for this now-established preference are well publicized; they include the historically meager return to unsecured creditors in Chapter 7 liquidations, [footnote omitted] the preservation of the fresh start, [footnote omitted] and Chapter 13's emphasis upon repayment, rather than discharge, of unsecured debt." Gerson, SEPARATE CLASSIFICATION OF STUDENT LOANS IN CHAPTER 13, 73 Wash.U.L.Q. 269 (1995). The inducements Congress intended to encourage debtors to file Chapter 13 repayment plans include allowing a debtor to retain property as opposed to surrendering it in Chapter 7 and the more expansive breadth of the Chapter 13 discharge. Id. at 275. Congress provided that debts which are nondischargeable may nevertheless be deferred and paid down under a Chapter 13 plan. Hildebrand, BANKRUPTCY REFORM ACT: ENHANCED USE OF CHAPTER 13?, 14– APR Am.Bankr.Inst.J. 16 (1995). Incentives continue to be created due to the fact that the newly amended Bankruptcy Code adds certain debts to the nondischargeable category in Chapter 7 (section 523), but not in Chapter 13. Id. at 16. Additional inducements stem from the fact that Congress allowed debtors to *repay* debt under a plan. These inducements include an improved credit rating coming out of bankruptcy, as well as the pure psychological satisfaction of having repaid one's debts. Gerson, SEPARATE CLASSIFICATION OF STUDENT LOANS IN CHAPTER 13, at 275–276. For further discussion of Chapter 13's history and purpose, see Tabb, THE HISTORY OF THE BANKRUPTCY LAWS IN THE UNITED STATES, 3 Am.Bankr. L.Rev. 5 (1995); Whelan, Cohen and Wexler, CONSUMER BANKRUPTCY REFORM: BALANCING THE EQUITIES IN CHAPTER 13, 2 Am.Bankr.L.Rev. 165 (1994); Aaron, BANKRUPTCY LAW FUNDAMENTALS, §§ 1.06, 13.01 (Clark, Boardman & Callaghan eds. 1993).

classes of creditors if the disparity were essential to the success of the plan and necessary to protect the cosigner from financial ruin. This plan takes the wisdom of Congress in allowing the separate classification of codebtor claims and turns it upside down to suggest that the right to separately classify the codebtor claim creates the right to eliminate the claims of other creditors. Until the congressional mandate is rendered more specific to that effect by some amendment, the provisions of the present Code will not be interpreted by this Court to accomplish that result.

The effect of Debtors' proposal in this case is to preserve the wealth of the codebtor at the expense of the other unsecured creditors. This objective is particularly unattractive when it is apparent that the wealth of the codebtor might reasonably be considered to be a financial resource of Debtors themselves. In answer to the Debtors' position that the Court is without discretion to disapprove the separate classification, let it be understood that the good faith requirement is believed by this Court to be an expansive confirmation criteria which preserves in every case the discretion of this Court to insure that the result of the confirmation of a Chapter 13 plan is in conformity with Congressional intent and not an abuse of the system. *Kitchens,* 702 F.2d at 888. There is no provision in the Code which can be interpreted to prevent the exercise of such discretion in the Chapter 13 confirmation process and, on a more urgent level, it is, in fact, compelled to exercise that discretion in any case where it appears that the failure to do so would create an inequitable result.

Confirmation of this Chapter 13 plan will be denied. Debtors will be allowed a period of ten (10) days following the entry of this order to file a modification to the Chapter 13 plan or, in the alternative, a conversion of this Chapter 13 case to a case under Chapter 7. If Debtors elect neither, an order will thereafter be entered dismissing this Chapter 13 case.

An order in accordance with this memorandum opinion will be entered on this date.

### ORDER

Debtors seek confirmation of their Chapter 13 Plan of Reorganization. This order is entered in accordance with the findings of fact and conclusions of law set out in the accompanying Memorandum Opinion published pursuant to Fed.R.Bankr.P. 7052.

Now, therefore it is hereby

ORDERED that confirmation of this Chapter 13 plan be and it hereby is DENIED; and it is hereby further

ORDERED that in the absence of either a modification or conversion filed by Debtors within ten (10) days of the date of this order, this underlying Chapter 13 case will be dismissed.