**In re Erica Jane RUSSELL, Debtor.**

No. 13–50045.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Dec. 31, 2013.

Michael A. Cox, Columbus, OH, for Debtor.

*MEMORANDUM OPINION AND OR-DER ON TRUSTEE'S OBJECTION TO CONFIRMATION OF CHAP-TER 13 PLAN*

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

## I. Introduction

In her Chapter 13 plan, Erica Jane Russell proposes to pay a higher dividend to holders of cosigned consumer debts than to her other general unsecured creditors. The Chapter 13 trustee contends that this differential treatment unfairly discriminates against creditors holding debts that are not cosigned. But the Bankruptcy Code permits a Chapter 13 debtor's plan to pay a higher dividend to creditors holding cosigned consumer debts than it pays to other unsecured creditors, and there is no other basis to conclude that the plan discriminates unfairly against creditors holding non-cosigned debts. The Court finds, therefore, that the plan does not violate the Bankruptcy Code's prohibition against unfair discrimination.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(L).

## III. Background

On January 3, 2013 ("Petition Date"), Russell commenced her bankruptcy case by filing a petition for relief under Chapter 13 of the Bankruptcy Code. That same day, she filed a Chapter 13 plan. Jeffrey P. Norman, the Chapter 13 trustee ("Trustee"), objected to the plan because, among other things, it gave creditors holding cosigned consumer debts more favorable treatment than those creditors holding non-cosigned debts. Russell filed an amended plan, followed by a second amended plan (Doc. 18) ("Plan"). Like the original plan, the Plan called for the payment of a higher dividend to holders of cosigned consumer claims than it provided to other unsecured, nonpriority claim holders. Apparently anticipating another objection from the Trustee, Russell filed a memorandum in support of confirmation (Doc. 25) in which she took the position that the Plan treated all of her unsecured creditors fairly. The Trustee filed an objection to the Plan ("Objection") (Doc. 26) on the ground that it "does not meet the requirements of 11 U.S.C. § 1322(b)(1)," which prohibits unfair discrimination in the treatment of unsecured claims in Chapter 13 cases. The Trustee also filed a memorandum supporting the Objection (Doc. 28).

The parties also filed joint stipulations of facts ("Stipulations") (Doc. 27), which state:

1. ... If confirmed and completed, the Plan will pay approximately 1.6% to general unsecured creditors.

2. The Plan contains Special Provisions separately classifying the claims [of] Arrowood Indemnity/Tuitiongard ("Arrowood") and Peoples United ("Peoples"), providing for monthly payments

of $200.00 to Arrowood and $100.00 to Peoples.

3. [Jane Regan, Russell's mother, co-signed] [t]he Arrowood and Peoples loans.

4. Prior to filing the present case, [Russell] entered into informal forbearance agreements with Arrowood and Peoples in which the lenders have agreed not to pursue [Regan] in exchange for monthly payments of $200.00 and $100.00, respectively.

5. If the Plan is confirmed and completed, and assuming Arrowood and Peoples have allowed claims, then during the 60 month commitment period Arrowood will receive payments totaling approximately 17.9% of its claim, and Peoples will receive approximately 65.4% of its claim.

6. If the separate classifications were removed and the Arrowood and Peoples claims were included in the pool of general unsecured creditors, then the Plan would pay approximately 15% of general unsecured claims.

7. [Russell incurred] [t]he Arrowood and Peoples debts ... to pay [her own] tuition and/or education[al] expenses.... These claims constitute "consumer debts" pursuant to 11 U.S.C. § 101(8).

8. [Russell's] motivation for paying more to Arrowood and Peoples is to protect [Regan] from collection upon the student loans that were incurred for the benefit of [Russell].

9. The sole basis for separate classification of the Arrowood and Peoples claims is the co-signed nature of the claims, in order to protect [Regan].

Stipulations at 1–2.

## IV. Legal Analysis

### A. Section 1322(b)(1)

■ The Trustee's only objection to confirmation is that the Plan violates § 1322(b)(1) by discriminating unfairly against creditors holding non-cosigned debts. The Court interprets § 1322(b)(1) by "start[ing] where all such inquiries must begin: with the language of the statute itself." *Ransom v. FIA Card Servs., N.A.,* —— U.S. ——, 131 S.Ct. 716, 723, 178 L.Ed.2d 603 (2011) (internal quotation marks omitted). Under § 1322(b)(1), a Chapter 13 plan may:

> designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims[.]

11 U.S.C. § 1322(b)(1).

■ The Trustee relies on the first part of § 1322(b)(1), which states that a plan "may not discriminate unfairly against" any class of unsecured claims. In this context, discrimination means treating a class of unsecured claims in a different manner than other classes of unsecured claims. *See Bentley v. Boyajian (In re Bentley),* 266 B.R. 229, 237 (1st Cir. BAP 2001) (discussing dictionary definitions of the word *discriminate* ). Thus, a plan *discriminates against* a class of unsecured claims if it treats that class less favorably than it treats other classes of unsecured claims. Section 1322(b)(1) prohibits this differential treatment if it is unfair. But, as discussed below, the statutory text of § 1322(b)(1) contains more than a general prohibition against unfair discrimination.

■ Russell relies on the final clause of § 1322(b)(1), under which a plan that separately classifies claims for consumer debts "may treat claims for a consumer debt of

the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims." 11 U.S.C. § 1322(b)(1).[1] Because this part of § 1322(b)(1) begins with the word "however," courts commonly refer to it as the "however clause." *See, e.g., Meyer v. Renteria (In re Renteria)*, 470 B.R. 838, 841 (9th Cir. BAP 2012). In the context of § 1322(b)(1), the word "however" is an adverb meaning "in spite of that." *Merriam–Webster Unabridged Dictionary*, available at http://unabridged.merriam-webster.com/unabridged/however. *See also Ramirez v. Bracher (In re Ramirez)*, 204 F.3d 595, 599 (5th Cir.2000) (Benavides, J., concurring) (" 'However' is defined as 'in spite of that; on the other hand; BUT.' "). Thus, despite the prohibition against treating classes of unsecured claims differently if doing so is unfair, a plan "may treat *claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor* differently than other unsecured claims." 11 U.S.C. § 1322(b)(1) (emphasis added).

■ The phrase *liable on such consumer debt with the debtor* "include[s] [claims held by] codebtors, sureties, and guaran-

tors." *Meyer v. Hill (In re Hill)*, 268 B.R. 548, 553 (9th Cir. BAP 2001). Because Russell's mother cosigned the debts, the claims of Arrowood and Peoples fall squarely within the category of "claims for a consumer debt of the debtor [on which] an individual is liable on such consumer debt with the debtor." 11 U.S.C. § 1322(b)(1). The however clause therefore permits the Plan to treat those claims differently than it treats other unsecured claims. The analysis, though, does not end there.

## B. The Ambiguity of the However Clause

In any case in which the however clause applies, the difficulty is determining the extent to which the plan may treat cosigned consumer debts differently. Indeed, the clause has created a number of interpretative questions regarding the circumstances under which a plan may treat codebtor consumer claims differently than it treats other unsecured claims. For example, several bankruptcy courts have held that the clause does not permit a debtor to pay cosigned consumer debts a *lower* dividend than other unsecured, nonpriority claims,[2] but the language of

---

1. Under § 1322(b)(5) of the Bankruptcy Code, a Chapter 13 plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." 11 U.S.C. § 1322(b)(5). Relying on this provision, Russell noted that the payments on the Arrowood and Peoples debts are last due after the date on which the final payment under the Plan is due and argued that the long-term nature of those debts meant that the Plan discriminates fairly in favor of the Arrowood and Peoples claims. *See* Mem. in Supp. of Confirmation at 6–8. But the Court need not address that argument, because the parties have since stipulated that the sole basis for separate classification of the Arrowood and Peoples claims is

the cosigned nature of the claims. *See* Tr.'s Mem. at 2–3 ("[Russell's] Amended Schedule F ... includes other claims for educational loans which could be considered 'long-term' claims pursuant to 11 U.S.C. § 1322(b)(5) because the last payments on these loans are due after the date on which the final payment under the plan is due. Therefore, although [Russell's memorandum] addresses 'long-term' treatment under § 1325(b)(5) as a basis for the classification, Trustee and [Russell] have stipulated that the sole basis for separate classification of the Arrowood and Peoples claims is the co-signed nature of the claims, in order to protect [Regan].").

2. *See In re Vollman*, 383 B.R. 696, 698 (Bankr.S.D.Ohio 2008); *In re Burnip*, 229 B.R. 904, 906 (Bankr.S.D.Ohio 1999); *In re Markham*, 224 B.R. 599, 601 (Bankr.W.D.Ky.

§ 1322(b)(1) can be—and has been—read to support a contrary conclusion. *See Renteria,* 470 B.R. at 850 n. 14 (Pappas, J., concurring) ("In addition to conferring beneficial treatment, § 1322(b)(1) also plainly authorizes a debtor to separately classify and treat a co-signed consumer claim less favorably than other unsecured creditors.").

If confirmed, the Plan would pay a higher dividend on codebtor consumer claims than it would pay on other unsecured claims. And, as noted above, Russell's mother cosigned the Arrowood and Peoples debts for the benefit of Russell, the Chapter 13 debtor. The Court, therefore, limits its analysis of the however clause to circumstances in which (1) the plan pays cosigned consumer debts a higher dividend than it pays other unsecured claims and (2) a nondebtor cosigned the debt for the debtor's benefit. But even with those limitations, there are at least two possible interpretations of the however clause.

*First,* the however clause could be read as an *exception* to the prohibition against unfair discrimination. Under this interpretation, a court—without conducting an unfair—discrimination analysis—may confirm a Chapter 13 plan that treats co-signed consumer debts better than other unsecured claims. Courts adopting this approach find support for it in the language and structure of § 1322(b)(1): its second part begins with the word "however," which arguably makes that part an exception to the first, and, because the first part prohibits unfair discrimination, the types of claims that are subject to the exception need not be analyzed for unfair discrimination.[3] According to these courts, if the however clause is not an exception to the first part of § 1322(b)(1), then it serves no purpose. This is the minority view. *See Renteria,* 470 B.R. at 842 ("The minority [of] courts ... have held that the 'however clause' ... carves out codebtor consumer claims from the requirements of the unfair discrimination rule.... These cases emphasize the placement of the 'however clause' immediately following the unfair discrimination rule.").

---

1998); *In re Davis,* 101 B.R. 505, 507 (Bankr. S.D.Ohio 1989); *In re Diaz,* 97 B.R. 903, 905 (Bankr.S.D.Ohio 1989); *In re Dondero,* 58 B.R. 847, 849 (Bankr.S.D.Or.1986).

**3.** Under this interpretive approach, some courts reason that the however clause permits Chapter 13 plans to treat codebtor consumer claims better than other unsecured claims even if doing so is unfair. *See Ramirez,* 204 F.3d at 597 (Benavides, J., concurring) ("Different treatments, which the statute expressly authorizes for co-signed debts, sometimes result in unfair discrimination."); *Renteria,* 470 B.R. at 850 (Pappas, J., concurring) ("I would hold that, because Congress authorized it, a chapter 13 plan may treat co-signed consumer claims differently, even though that treatment may, in some cases, be unfair when compared to that given the claims of other creditors."). At least one court has concluded that the however clause permits the differential treatment on the grounds that it is per se fair to treat cosigned consumer debts better than other unsecured claims. *See In re Deen,*

260 B.R. 577, 584 (Bankr.S.D.Ga.2000) ("The [however clause] clarifies that if a class of claims for unsecured consumer debt, on which an individual is liable with the debtor, is paid concurrently with secured claims as allowed by Section 1322(b)(4), such does not constitute unfair discrimination against other classes of unsecured claims that are not paid concurrently with secured claims."). But most courts in this camp uphold the differential treatment based on the however clause without clearly stating the rationale for doing so, i.e., whether the clause essentially authorizes unfair discrimination in favor of cosigned debts or renders discrimination in favor of cosigned debts per se fair. *See In re Rivera,* 480 B.R. 112 (Bankr.D.P.R.2012), *aff'd,* 490 B.R. 130 (1st Cir. BAP 2013); *In re Renteria,* 456 B.R. 444 (Bankr.E.D.Cal.2011), *aff'd,* 470 B.R. 838 (9th Cir. BAP 2012); *In re Monroe,* 281 B.R. 398 (Bankr.N.D.Ga.2002); *In re Riggel,* 142 B.R. 199 (Bankr.S.D.Ohio 1992); *In re Dornon,* 103 B.R. 61 (Bankr.N.D.N.Y. 1989).

*Second,* the however clause could be read as a *qualification of* the prohibition against unfair discrimination. This is the majority view. *See id.* at 841–42 ("Most courts hold that separately classified co-obligor debts must still clear the § 1322(b)(1) unfair discrimination hurdle. The consequence is that the 'however' clause permitting co-obligor debts to be treated 'differently' is more in the nature of a qualification to the application of the unfair discrimination analysis than an exemption from it." (quoting *Meyer v. Hill (In re Hill),* 268 B.R. 548, 550 (9th Cir. BAP 2001))). According to the majority view, while debtors might propose to treat cosigned unsecured debts differently in a myriad of ways, the however clause does not mean that Congress intended to permit them all. Like the courts in the minority camp, courts adopting this approach find support for it in the language of § 1322(b)(1). The however clause, they point out, states that a plan may treat codebtor consumer claims differently; it does not say that a plan may discriminate unfairly in favor of such claims. *See id.* at 842 (noting that the first part of § 1322(b)(1) "refers to 'unfair discrimination' whereas the [however clause] refers to 'different treatment' " and stating that "[t]his difference in language arguably suggests that Congress intended something other than to completely exempt co-debtor consumer claims from the unfair discrimination rule").

▮▮▮ Even as applied to the facts of this case, therefore, there are at least two plausible ways to interpret the however clause. Because a statute is ambiguous if it is "capable of being understood in two or more possible senses or ways[,]" *Chickasaw Nation v. United States,* 534 U.S. 84, 90, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (internal quotation marks omitted), several courts have found the however clause to be ambiguous.[4] The Court thus concludes that § 1322(b)(1) is ambiguous insofar as its application to the Plan is concerned. Given this ambiguity, the Court looks to the legislative history leading to the enactment of the however clause for interpretive guidance.[5]

## C. The History of the Provision

When originally enacted as part of the Bankruptcy Reform Act of 1978, § 1322(b)(1) did not include the however clause. Instead, it stated only that a plan may "designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated." 11 U.S.C. § 1322(b)(1) (1978) (amended 1984).

---

**4.** *See Matson v. Bracher (In re Matson),* Case No. 99–50500, 2000 WL 309801, at *1 (5th Cir. Mar. 2, 2000) (describing the however clause as "ambiguously-worded"); *Renteria,* 470 B.R. at 844 ("At least one thing is clear to us from the above-referenced differing interpretations and battling canons of construction: courts have been unable to derive from the text of the statute a plain and unambiguous meaning for the 'however clause.' "); *id.* at 849 (Pappas, J., concurring) ("[M]ore than a few courts have, like my two colleagues, considered the [however clause] to be ambiguous.... I agree a case can be made that the meaning of the statute is not clear...."); *In re Rivera,* 480 B.R. at 115 (finding the however clause to be ambiguous).

**5.** *See United States v. R.L.C.,* 503 U.S. 291, 298, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992) ("On the assumption that ambiguity exists, we turn to examine the textual evolution of the limitation in question and the legislative history that may explain or elucidate it."); *Baud v. Carroll,* 634 F.3d 327, 352 n. 20 (6th Cir. 2011) ("[I]t ... is appropriate to consult legislative history in this case because where, as here, a textual analysis fails to produce a conclusive result, or where it leads to ambiguous ... results, a court may look to legislative history to interpret a statute.") (internal quotations marks omitted), *cert. denied,* — U.S. ——, 132 S.Ct. 997, 181 L.Ed.2d 732 (2012).

Early on, the majority of courts interpreting the original version of § 1322(b)(1) held that it was per se unfair for a plan to provide a higher dividend to holders of cosigned debts than to other unsecured creditors.[6] These courts reasoned that creditors with equal rights to property of the estate were entitled to equal treatment; that all holders of unsecured, nonpriority claims had equal rights to property of the estate; and that a plan therefore could not pay holders of cosigned consumer debts a higher dividend than it paid other unsecured, nonpriority creditors. *See, e.g., Montano,* 4 B.R. at 537 ("Inasmuch as the holder of a co-obligor debt has the same legal rights against the debtor's assets as other general unsecured creditors, a separate classification is not allowable. . . . For the same reasons, such classification, where cosigned debts are to be paid in full and other general unsecured debts are to be paid much less, unfairly discriminates against the latter class. . . ."); *Utter,* 3 B.R. at 369 ("[A]ll allowed, non-priority, unsecured claims have equal right to pro rata distribution of assets after payment of secured and priority claims." (quoting *Iacovoni,* 2 B.R. at 260)).

Although the Bankruptcy Improvements Act of 1981 ("1981 Act"), H.R. 4786, 97th Cong. (1981), would have amended § 1322(b)(1) to permit Chapter 13 plans to separately classify cosigned debts, it was not enacted. The Omnibus Bankruptcy Improvements Act of 1983 ("1983 Act"), S. 445, 98th Cong. (1983), was later proposed, but, like the 1981 Act, it did not result in § 1322(b)(1)'s amendment.[7]

Congress ultimately did amend § 1322(b)(1) to add the however clause as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), H.R. 5174, 98th Cong. (1984). BAFJA's legislative history did not provide any explanation for the amendment. But for purposes of the issue before the Court, the however clause is substantially similar to the amendment to § 1322(b)(1) proposed by the 1983 Act. *See* S. 445, 98th Cong. § 219 (1983) (stating that the 1983 Act would have amended § 1322(b)(1) to provide that a Chapter 13 plan may "designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims which are specified in section 523(a) or involve a codebtor differently than other unsecured claims").[8]

---

**6.** *See Am. Family Ins. Grp. v. Barker (In re Barker),* 7 B.R. 707, 710 (Bankr.W.D.Mo. 1980); *In re Montano,* 4 B.R. 535, 537 (Bankr.D.D.C.1980), *aff'd sub nom. In re Barnes,* 13 B.R. 997 (D.D.C.1981); *In re Wade,* 4 B.R. 98, 100 (Bankr.M.D.Tenn.1980); *In re McKenzie,* 4 B.R. 88, 91 (Bankr. W.D.N.Y.1980); *In re Utter,* 3 B.R. 369, 370 (Bankr.W.D.N.Y.1980); *In re Iacovoni,* 2 B.R. 256, 260–61 (Bankr.D.Utah 1980).

**7.** At the time the 1981 Act was being considered, only one court had held that it was not per se unfair to pay a higher dividend on claims for cosigned debts. *See In re Kovich,* 4 B.R. 403, 407 (Bankr.W.D.Mich.1980) ("The fact that these creditors [holding claims for cosigned debts] receive more than other unsecured creditors, certainly is a form of discrim-

ination. But it is not necessarily unfair."). By the time Congress was considering the 1983 Act, several more courts had held that a plan could, at least under certain circumstances, pay a higher dividend to holders of claims based on cosigned debts than the dividend paid to other unsecured, nonpriority claimants. *See Public Fin. Corp. v. Freeman,* 712 F.2d 219, 222 (5th Cir.1983); *In re Moore,* 31 B.R. 12, 16 (Bankr.D.S.C.1983); *Worthen Bank & Trust Co. v. Cook (In re Cook),* 26 B.R. 187, 190 (D.N.M.1982); *In re Vanleeuween,* 17 B.R. 189, 191–92 (Bankr. S.D.Ohio 1982).

**8.** Unlike the 1983 Act, BAFJA did not include "claims which are specified in section 523(a)" in the however clause.

When interpreting the however clause, therefore, the Court may consider the 1983 Act's legislative history. *See, e.g., Renteria,* 470 B.R. at 844.[9]

■ In the 1983 Act's legislative history, the Senate Judiciary Committee recognized that debtors often feel obligated to propose plans that protect nondebtor cosigners. Thus, one purpose of the proposed amendment was to permit debtors to fulfill this sense of obligation:

> Although there may be no theoretical differences between codebtor claims and others, there are important practical differences. Often, the codebtor will be a relative or friend, and the debtor feels compelled to pay the claim. If the debtor is going to pay the debt anyway, it is important that this fact be considered in determining the feasibility of the plan. Sometimes, the codebtor will have posted collateral, and the debtor will feel obligated to make the payment to avoid repossession of the collateral. In still other cases, the codebtor cannot make the payment, and the effect of nonpayment will be to trigger a chapter 7 or chapter 13 petition by the codebtor, which may have a ripple effect on other parties as well. For these reasons, separate classification is often practically necessary. Courts under both the present Act and the former law have emphasized that plans must be realistic. For example, courts have refused to confirm plans which the debtor could not possibly perform; have insisted on realistic estimates of expenditures; and have considered debts which the debtor proposes to pay outside the plan in determining feasibility. .... This approach is eminently sensible. No pur-

pose is served by confirming a plan which the debtor cannot perform. If, as a practical matter, the debtor is going to pay the codebtor claim, he should be permitted to separately classify it in chapter 13. A result which emphasizes purity in classifying claims does so at the price of a realistic plan. Neither debtors nor creditors benefit from such a rigid approach, and the Committee has determined that statutory authority to separately schedule such debts will contribute to the success of plans contemplating repayment of same. Accordingly, this authority is provided for in the proposed bill by amendment to section 1322(b)(1).

S.Rep. No. 98–65 (1983), available at BANKR84–LH 4 (Westlaw).

In addition, the committee report mentioned two cases, *Utter* and *Montano,* as examples of cases that "refused to permit [separate] classification on the ground that codebtor claims are not different than other claims." *See* S.Rep. No. 98–65 (1983), available at BANKR84–LH 4 (Westlaw). In *Utter,* the bankruptcy court held that classifying codebtor consumer claims in one class and paying them a hundred cents on the dollar while separately classifying other unsecured claims and paying them "little or nothing" constituted unfair discrimination. *Utter,* 3 B.R. at 369. Similarly, in *Montano* the bankruptcy court considered a plan providing for "100% payments to the unsecured creditors with claims guaranteed by co-signers ... [and] a 1% payment to the remaining unsecured creditors[,]" *Montano,* 4 B.R. at 536, holding that where "cosigned debts are to be paid in full and other general unsecured debts are to be paid much less, [the plan]

---

**9.** *Cf. United States v. Enmons,* 410 U.S. 396, 405 n. 14, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) ("The remarks with respect to that [original] bill ..., which passed only the

House, are wholly relevant to an understanding of the Hobbs Act, since the operative language of the original bill was substantially carried forward into the Act.").

unfairly discriminates against the latter class, and thus is [im]permissible under § 1322(b)(1)." *Id.* at 537.

The 1983 Act's legislative history stated that a purpose of the "amendment to section 1322(b)(1)" was to "permit[ ] separate classification of . . . codebtor obligations *so as to facilitate payment of the amount the holders of such claims would have received but for the chapter 13 proceedings.*" S.Rep. No. 98–65 (1983), available at BANKR84–LH 4 (Westlaw) (emphasis added). Of course, most Chapter 13 plans offer unsecured, nonpriority creditors much less than the amount they would have received absent a Chapter 13 case. And Congress would have been aware that paying cosigned consumer debts in full, as was attempted by the debtors in *Utter* and *Montano,* dilutes the distribution to other unsecured, nonpriority creditors. Yet the legislative history evidences an intent to overrule *Utter* and *Montano* and permit holders of cosigned consumer debts to be paid the amount they would have received but for the Chapter 13 case.

■ The history of the enactment of the however clause, therefore, makes at least one thing clear: a plan may propose to pay creditors with cosigned consumer debts the amount they would have received but for the Chapter 13 case, while paying the holders of other unsecured, nonpriority claims less (even much less) than they would have received had they been paid pro rata with the cosigned debts. *See Renteria,* 470 B.R. at 846 ("In light of the facts and holdings of *Utter* and *Montano,* and in light of Congress's citation of these two cases as exemplifying the case law it sought to address by amending § 1322(b)(1), we hold that Congress sought to permit a chapter 13 debtor to separately classify *and* to prefer a codebtor consumer claim when the facts are similar to those presented in *Utter* and *Montano.*"). Thus, the disparity in the dividend paid on co-debtor consumer claims as compared to that paid on other unsecured claims should not be a factor in analyzing whether a plan complies with § 1322(b)(1).

The Trustee argues to the contrary, maintaining that a plan violates § 1322(b)(1) if the discrepancy between the dividend paid on claims arising from cosigned consumer debts and the dividend paid on other unsecured claims is "great." Tr.'s Mem. at 4. In support of this argument, the Trustee relies on several decisions issued in the student loan context. Those decisions, however, did not arise in the context of *cosigned* student-loan debt; the issue in those cases was whether the *nondischargeability* of student loan claims and/or the *long-term nature* of student loan debt justified paying student-loan claims a higher dividend than other unsecured claims. *See* Tr.'s Mem. at 4–5. (citing cases holding that neither the nondischargeability of student loan claims nor the long-term nature of those claims justified paying the claims a significantly higher dividend than other unsecured claims). Russell, though, has never argued that the nondischargeability of her student-loan debt warrants paying the claims of Arrowood and Peoples a higher dividend than other unsecured claims. And, as already explained, she is no longer making the argument that the long-term nature of those claims renders the discrimination fair.

The Trustee does cite a cosigned debt case decided after the enactment of the however clause that analyzed unfair discrimination by looking at, among other factors, "[t]he difference between what the creditors discriminated against will receive as the plan is proposed, and the amount they would receive if there was no separate classification." *In re Strausser,* 206 B.R. 58, 60 (Bankr.W.D.N.Y.1997) (internal

quotation marks omitted). But using that factor to assess the confirmability of a plan discriminating in favor of a cosigned consumer debts after the addition of the however clause is inconsistent with congressional intent in adding the however clause to § 1322(b)(1), i.e., to permit, in an exercise of practicality, holders of codebtor consumer claims to receive "payment of the amount the holders of such claims would have received but for the chapter 13 proceedings." S.Rep. No. 98–65 (1983). As explained above, in light of the however clause, a disparity—even a large one—between the dividend paid on such claims and the dividend paid on other unsecured claims does not itself constitute unfair discrimination.

## D. Cosigned Consumer Debts and Unfair Discrimination

█ Whether Congress intended courts to apply some form of unfair discrimination analysis in the face of other objections based on § 1322(b)(1) is another question. The answer to this question lies in the recognition that debtors sometimes propose to pay creditors holding cosigned consumer debts *more* than they would have received in the absence of a Chapter 13 case—a result Congress did not intend. For example, debtors have proposed plans that would accelerate payments to such creditors. *See In re Whitelock*, 122 B.R. 582, 586 (Bankr.D.Utah 1990) ("The plan classified into one class all unsecured claims except the FSB cosigned claim[,] [whose] treatment would result in the accelerated payment of FSB's claim in 60 months, instead of the 108

months provided by the terms of the note."). In addition, debtors have proposed to "reimburs[e] interest where none is due or reimburs[e] more than the actual amount of the cosigned debt." *Chacon v. Bracher (In re Chacon)*, 202 F.3d 725, 726 (5th Cir.1999).

█ As the legislative history demonstrates, Congress did not intend to permit debtors to accelerate the payment of cosigned consumer debts, to overpay such debts or to pay interest to which creditors are not entitled; after all, this would result in creditors holding codebtor consumer claims receiving more than "the amount the holders of such claims would have received but for the chapter 13 proceedings." S.Rep. No. 98–65 (1983). Yet there is nothing in the however clause that prohibits those practices. Instead, the prohibition lies in the first part of § 1322(b)(1). *See Chacon*, 202 F.3d at 726–27 (affirming the judgment of the bankruptcy court and the district court denying confirmation of the debtor's Chapter 13 plan where "[t]he debtor proposed to pay the cosigned debt in full, with 12% interest, prior to any distributions to the general unsecured class" because "[n]o justification appears for a high and preferential interest rate"); *Whitelock*, 122 B.R. at 591 ("[A]n accelerated payment beyond a legal obligation at the expense of other creditors [is an] indicia of unfairness."). The Court therefore concludes that Congress intended courts to apply some form of unfair discrimination analysis in the context of cosigned consumer debts. This is the overwhelming majority view.[10]

**10.** *See, e.g., Chacon*, 202 F.3d at 726; *Spokane Ry. Credit Union v. Gonzales (In re Gonzales)*, 172 B.R. 320, 328–30 (E.D.Wash.1994); *In re Linton*, No. 11–12258–SSM, 2011 WL 3207366, at *2 (Bankr.E.D.Va. July 27, 2011); *In re Lilley*, No. 10–01079, 2010 WL 5462519, at *3 (Bankr.N.D.Iowa Dec. 29, 2010); *In re*

*Beauchamp*, 283 B.R. 287, 289 (Bankr. D.Minn.2002); *In re Husemann*, No. 00–13511–JMD, 2001 WL 1757048, at *4 (Bankr. D.N.H. Sept. 4, 2001); *In re McNichols*, 249 B.R. 160, 176 (Bankr.N.D.Ill.2000); *In re Massey*, No. 00–33272–S, 2000 WL 33953691, at *1 (Bankr.E.D.Va. Oct. 6, 2000); *In re*

As discussed above, courts have found unfairness whenever debtors pay holders of cosigned debts more than they would have received but for a Chapter 13 case.[11] In addition, courts have held that preferring cosigned consumer debts is unfair where the discrimination inappropriately protects assets and income that are effectively the debtor's. For example, "a Chapter 13 debtor [might propose to] pay[] 10% to general unsecured creditors, but 100% to unsecured creditors who have received the co-signature of a spouse" even though "the spouse may have an abundance of disposable income, may be paying for high value luxury items, or may be protecting extensive property holdings[,]" all of which may inure to the benefit of the debtor. *In re Martin,* 189 B.R. 619, 628 (Bankr.E.D.Va.1995). The *Martin* court pointed out that "[i]t would be difficult for [a bankruptcy court] to look with favor on a debtor's plan which proposes to pay 10% to general unsecured creditors and 100% to co-signed unsecured creditors while the debtor's spouse makes payments on a Lamborghini." *Id. See also Cheak,* 171 B.R. at 58 ("The separate income of the debtor's wife presumably benefits the debtor to the extent they, as a married couple, pool their income for household expenses. Thus, if the debtor were permitted to pay 100% of this co-signed claim through his Chapter 13 plan, he would protect his wife's income and thereby benefit himself at the expense of other unsecured creditors."). The facts of these cases suggest a desire on the part of the debtor to accomplish a goal other than merely protecting the nondebtor cosigner.

## E. Application to the Plan

■ Here, there is no suggestion that the Plan would pay Arrowood and Peoples more than they would have received but for the Chapter 13 case or that the Plan would accelerate the payment of the amounts they are owed. Further, prior to the Petition Date, Arrowood and Peoples agreed not to pursue Regan in exchange for the monthly payments proposed in the Plan, and Russell's motivation for paying a greater dividend to Arrowood and Peoples is to protect her mother from attempts by Arrowood and Peoples to collect on the student loans. Thus, the treatment proposed by the Plan presents the quintessential case that motivated Congress to amend § 1322(b)(1) to add the however clause.

The sole basis for the Objection is that the Plan proposes to pay significantly higher dividends on the claims of Arrowood and Peoples than it pays on Russell's other unsecured claims. But because the however clause permits the preferential treatment of the Arrowood and Peoples

---

*Regine,* 234 B.R. 4, 5 (Bankr.D.R.I.1999); *In re McKown,* 227 B.R. 487, 492 (Bankr. N.D.Ohio 1998); *In re Applegarth,* 221 B.R. 914, 915–16 (Bankr.M.D.Fla.1998); *In re Janssen,* 220 B.R. 639, 643 (Bankr.N.D.Iowa 1998); *Strausser,* 206 B.R. at 59–60; *In re Battista,* 180 B.R. 355, 357 (Bankr.D.N.H. 1995); *In re Cheak,* 171 B.R. 55, 58 (Bankr. S.D.Ill.1994); *Whitelock,* 122 B.R. at 588; *In re Hamilton,* 102 B.R. 498, 501 (Bankr. W.D.Va.1989); *Nelson v. Easley (In re Easley),* 72 B.R. 948, 956 (Bankr.M.D.Tenn.1987); *In re Todd,* 65 B.R. 249, 253 (Bankr.N.D.Ill. 1986); *In re Perkins,* 55 B.R. 422, 425 (Bankr. N.D.Okl.1985).

11. Courts also have found that plans unfairly discriminate in favor of cosigned consumer debts where nondebtors received the consideration for the debts—that is, where debtors cosigned the debts for the benefit of nondebtors. *See, e.g., Gonzales,* 172 B.R. at 329–30 ("[T]his court finds that § 1322(b)(1) is limited to co-signed debt acquired for the benefit of the debtor, not the co-signer."); *In re Santana,* 480 B.R. 222, 224–28 (Bankr.D.Puerto Rico 2012) (same). The Court expresses no view on that question here.

claims, the Plan does not run afoul of § 1322(b)(1).

## V. Conclusion

For the reasons stated above, the Court concludes that the Plan complies with § 1322(b)(1). The Objection therefore is **OVERRULED.**

**IT IS SO ORDERED.**